ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
       – and –
ANGEL P. LAU
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

| | | |
|---|---|---|
| In re UNUM GROUP SECURITIES LITIGATION | ) ) ) | Master File No. 1:18-cv-00128 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL |
| ALL ACTIONS. | ) ) | SECURITIES LAWS |
| | ) | |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................6

III.  PARTIES ..............................................................................................................6

IV.   SOURCES OF ALLEGATIONS........................................................................10

V.    BACKGROUND .................................................................................................10

    A.    Background of LTC Coverage...........................................................12

    B.    In December 2014, Unum Announces a Comprehensive Review of its LTC Reserves......................................................................................15

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................................17

    A.    Materially False and Misleading Statements and Omissions Concerning LTC Rate Increases ........................................................17

        1.    Pre-Class Period False Statements and Omissions Concerning LTC Rate Increases ..............................................................18

        2.    Class Period False Statements and Omissions Concerning LTC Rate Increases ..............................................................23

    B.    Materially False and Misleading Statements and Omissions Concerning the Group and Individual Policies........................................35

        1.    Pre-Class Period False Statements and Omissions Concerning the Group and Individual Policies ..................................35

        2.    Class Period False Statements and Omissions Concerning the Group and Individual Policies ..................................38

    C.    Materially False and Misleading Statements and Omissions Concerning the Interest-Adjusted Loss Ratio........................................46

        1.    Pre-Class Period False Statements and Omissions Concerning the Interest-Adjusted Loss Ratio.....................................46

        2.    Class Period False Statements and Omissions Concerning the Interest-Adjusted Loss Ratio.....................................48

D.     Materially False Statements and Omissions Concerning Reserves Monitoring and Adequacy ........................................................................59

     1.     Pre-Class Period False Statements and Omissions Concerning Reserves Monitoring and Adequacy ..........................................59

     2.     Class Period False Statements and Omissions Concerning Reserves Monitoring and Adequacy .........................................................62

VII.     DEFENDANTS' GAAP VIOLATIONS ............................................................75

A.     Defendants' Material Financial Misstatements .....................................75

B.     Defendants Misled Investors About the LTC Reserve ..........................79

C.     GAAP Applicable to Reserve Calculations ..........................................80

D.     Defendants Failed to Timely Address Adverse Trends Affecting the Reserve ................................................................................................82

E.     Unum's Adverse Trends Required an Increase to Reserves Effective 4Q2016 ................................................................................................85

F.     Defendants Attempted to Conceal Their Knowledge of Adverse Trends ............87

G.     GAAP Conclusions ..............................................................................91

VIII.     DEFENDANTS' VIOLATION OF ITEM 303 ..................................................92

A.     Defendants Failed to Fulfill the Purpose of the MD&A Sections of Unum's SEC Filings ..........................................................................92

B.     Defendants Failed to Disclose Known Trends and Uncertainties in the MD&A Sections of Unum's SEC Filings............................................95

IX.     THE RELEVANT TRUTH IS REVEALED....................................................98

X.     ADDITIONAL SCIENTER ALLEGATIONS................................................101

A.     Unum Settled a Class Action Alleging Rampant Fraud Involving Underpayment of Benefits to LTC Insureds.......................................102

1519354_1
Case 1:18-cv-00128-TAV-CHS   Document 37   Filed 01/15/19   Page 3 of 123   PageID #: 289

B.    Defendants' Admissions Came Shortly After Assuring Investors of the
      Adequacy of Unum's Reserves...............................................................................103

C.    Defendants Disregarded Current Factual Information When Seeking to
      Reassure Investors Regarding Unum's LTC Reserves.......................................104

D.    Defendants Refused to Provide Investors With the Information Necessary
      to Evaluate the Adequacy of Unum's LTC Reserves .........................................105

E.    McKenney and McGarry's Incentive Compensation Was Tied to the
      Operating Results of Unum's LTC Business.......................................................108

XI.    LOSS CAUSATION AND ECONOMIC LOSS ............................................................109

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE .............................................111

XIII.  CLASS ACTION ALLEGATIONS ...............................................................................113

COUNT I ........................................................................................................................................114

COUNT II .......................................................................................................................................115

PRAYER FOR RELIEF .................................................................................................................115

JURY TRIAL DEMAND ...............................................................................................................116

- iii -

## I.     INTRODUCTION

1.     This is a federal securities class action brought on behalf of all persons who purchased or otherwise acquired Unum Group ("Unum" or the "Company") securities between October 27, 2016, and May 1, 2018, inclusive (the "Class Period"). This action seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b 5.

2.     Unum is a $6.8 billion insurance company offering disability, life, accident, critical illness, dental and vision insurance products and other related services marketed primarily through the workplace in the United States ("U.S.") and the United Kingdom ("U.K."). The Company is headquartered in Chattanooga, Tennessee.

3.     During and prior to the Class Period, Unum, President and Chief Executive Officer ("CEO") Richard P. McKenney ("McKenney"), Chief Financial Officer ("CFO") John F. McGarry ("McGarry"), Unum Closed Block Operations ("Closed Block") President Steve Zabel ("Zabel") and Chief Accounting Officer Daniel J. Waxenberg ("Waxenberg") (collectively, "Defendants"), made materially false and misleading statements and omissions to Unum's investors and the market regarding Unum's long-term care ("LTC") insurance business and its financial performance, as well as the adequacy of its LTC reserves. These statements and omissions had the effect of artificially inflating and maintaining Unum's stock price, which declined when the relevant truth, including the inadequacies in Unum's reserves, was revealed at the end of the Class Period, causing losses to Lead Plaintiff and the proposed Class.

4.     LTC insurance is intended to protect consumers from the high cost of home care, assisted living care, adult day care, respite care, hospice care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic

activities of daily living. These costs are typically not covered by health insurance, Medicare, or Medicaid. Once considered a lucrative product for insurance companies, sales of LTC policies have plummeted since 2002, as emerging experience made clear that the assumptions historically used to price the policies were woefully inadequate, leading to billions of dollars of losses and reserve charges for LTC insurers across the country. Unum stopped selling individual LTC policies in 2009 and group LTC policies in 2012, yet continues to service and manage a block of LTC policies covering almost 1 million lives, which brings in over $600 million in premium income each year.

5.      As experience in the LTC industry worsened, the fallout was severe. Genworth Financial, Inc. ("Genworth"), the largest LTC carrier (and former employer of Defendants McKenney and Zabel), agreed to pay $219 million in 2016 to settle a lawsuit alleging that it intentionally understated its LTC reserves. General Electric Company ("GE") remains in the midst of civil and criminal investigations by the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") related to its announcement that it would have to pump $15 billion over seven years into its reserves to make up for dire shortfalls.

6.      All the while, Unum maintained it was different. "[W]e are in a very different place than GE is," said McGarry, when asked in February 2018 to discuss the "key differences" between the companies. But Unum was not so different, as McGarry would later concede. In fact, since before the beginning of the Class Period, Unum had been ignoring its own LTC experience in order to avoid costly increases to its LTC reserves, which would have negatively impacted its financial performance, its stock price, and its executives' lucrative bonuses. In the course of doing so, Defendants made myriad false and misleading statements and omissions to conceal their misconduct from investors.

7.      First, Defendants misled investors about Unum's success in securing premium rate increases from state insurance commissioners – increases which were essential to maintaining the

adequacy of its LTC reserves. When Unum increased its LTC reserves in 2014, it represented that the rate increase assumptions embedded in its reserves were based on Unum's historical experience attaining rate increases prior to 2014. Throughout and prior to the Class Period, Defendants repeatedly assured investors that they were "on track" to receive their projected rate increases.

8.      In fact, Unum was not on track. Data compiled from numerous state insurance commissioners shows that for at least 25 states, which represented approximately 53% of Unum's LTC policy premiums, regulators were increasingly rebuffing Unum's attempts to raise rates, including by delaying, reducing, or outright rejecting Unum's proposals, at levels far higher than Unum's historical experience. Unum internally tracked the results of its rate increase requests, knew its efforts were falling short, and *admitted* at the end of the Class Period that the Company had not received approvals as quickly as it projected, that the approvals it had received had been phased-in over a longer time period, and that these delays and rejections were negatively impacting its reported loss ratios and reserves.

9.      Second, Defendants misled investors about the composition and makeup of Unum's LTC block. In attempting to distinguish itself from other LTC carriers, Unum repeatedly emphasized the proportion of its LTC block which was made up of group policies – policies it characterized as "low risk," with "conservative plan designs," and which overall had both higher termination rates and lower benefits than individual policies. While it was true that group policies made up approximately 85% of Unum's LTC block by number of in-force lives, it was the individual block that was responsible for inadequacies in Unum's reserves.

10.     Between 2014 and 2017, despite amounting to only 15% of Unum's LTC block, individual LTC policies accounted for *over 79%* of Unum's incurred claims. In addition, the termination rates for Unum's individual policies were far lower than the rate Unum had projected in setting its reserves, and the dollar amount of incurred claims for its individual policies was 121%

*higher* than the amounts which formed the basis for Unum's reserves. As McGarry would later admit, this block was in fact, "not inconsistent with GE," and Defendants' omissions and repeated attempts to downplay the dire performance of this block misled investors regarding the risks associated with Unum's LTC business.

11. Third, Defendants misled investors regarding Unum's interest adjusted loss ratio, its ability to maintain its interest adjusted loss ratio within a manageable range, and the relevance of Unum's interest adjusted loss ratio in serving as a proxy for the adequacy of the Company's LTC reserves.

12. Unum emphasized its interest adjusted loss ratio as a key metric to enable investors to assess the risks in the Company's LTC block. An insurance loss ratio measures the ratio of losses from the payment of claims and benefits, to gains from premium income earned on a set of policies. The higher the loss ratio, the greater the claims in relation to earned premiums, and therefore the lower the profitability (or the greater the losses) from these policies, and the higher the likelihood that the insurer will need to take statutorily mandated reserve charges or increase the amount of its reserves to cover future claims.

13. Rather than provide investors with meaningful information which would allow them to judge the adequacy of Unum's LTC reserves for themselves, Unum assured investors that as long as its interest adjusted loss ratio stayed in a 85% to 90% range, the validity of its reserve assumptions would not be pressured. And when its interest adjusted loss ratio did exceed 90%, Unum blamed short term volatility for the increases, rather than systematic trends. This allowed Unum to conceal the continuing deterioration of the assumptions underlying its LTC reserves, and misled investors regarding the strength of its reserves.

14.     Finally, Unum materially overstated its financial results by understating its LTC reserves through the Class Period, and violated 17 C.F.R. §229.303 ("Item 303") by failing to fully disclose the worsening trends in its LTC block.

15.     On May 1, 2018, less than three months after again reassuring investors about the adequacy of its reserves, and just weeks after soliciting shareholder approval for multi-million dollar bonuses to its executives, Unum issued a release entitled "Unum Group Reports First Quarter 2018 Results." The 1Q2018 release reported that the Company's 1Q2018 LTC loss ratio had ballooned to 96.6%, compared to only 88.6% for 1Q2017. The 1Q2018 loss ratio also far exceeded the 85% to 90% long-term range and even the "low 90s" near-term range the Company had previously provided to investors.[1]

16.     On May 2, 2018, the Company hosted a conference call to discuss its 1Q2018 financial results. During the call, McGarry told investors that the premiums Unum received from approved rates increases had fallen short of the projections incorporated into Unum's Generally Accepted Accounting Principles ("GAAP") reserve expectation, increasing Unum's reported loss ratio "by 3% to 4%." These revelations made clear that Unum's LTC reserves were indeed inadequate, as Unum would later confirm when it was forced to increase its reserves by approximately $750 million before-tax in September 2018.

17.     On this news, the price of the Company's stock fell $8.12 per share, or nearly 17%, to close at $39.78 per share on May 2, 2018, on abnormally high trading volume, causing hundreds of millions of dollars in losses to investors who purchased Unum securities at artificially inflated prices during the Class Period. Securities analysts who covered Unum directly attributed these losses to

---

[1]     Specific quarters in a fiscal year ("FY") are designated by the quarter number followed by the letter Q. Thus, 1Q2018 indicates Unum's first quarter in fiscal year 2018.

Unum's reserve inadequacies: "[T]he stock is down 15% . . . *I think investors are doubting your reserve adequacy.*"

18.     This action seeks to recover for these losses.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and are pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

21.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, the Company's corporate headquarters are located in this District.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

23.     ("Lead Plaintiff" or "Plaintiff") City of Taylor Police and Fire Retirement System purchased Unum securities at prices artificially inflated by Defendants' fraud, as detailed in their Certification and incorporated herein.  ECF No. 1 at 27-29.

24.     Defendant Unum is an insurance provider based in Chattanooga, Tennessee.  Unum's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "UNM."  As of February 20, 2018, there were over 221 million shares of Unum's common stock outstanding. Unum's principal operating subsidiaries are Unum Life Insurance Company of America ("Unum

America"), Provident Life and Accident Insurance Company ("Provident"), The Paul Revere Life

Insurance Company ("Paul Revere Life"), Colonial Life & Accident Insurance Company ("Colonial

Life"), Starmount Life Insurance Company ("Starmount Life"), and Unum Limited. Unum claims to

be a leading provider of financial protection benefits, with insurance products including disability,

LTC, life, accident, critical illness, dental and vision, and other related services marketed primarily

through the workplace.

25.     Defendant McKenney served as President, CEO and a Director of Unum during the

Class Period. Prior to becoming President and CEO in April 2015 and May 2015, respectively,

McKenney served as Executive Vice President and CFO for Unum from 2009 to 2015, where he was

responsible for the overall financial management of the company, including financial reporting,

treasury and capital management, strategic planning and mergers and acquisitions, investments,

financial planning, investor relations, and enterprise risk management. McKenney also chaired

Unum's Operating Committee, which oversees the company's business operations throughout the

U.S. and U.K. Previously, McKenney joined GE Financial Assurance, the GE entity known at the

time as the dominant seller of LTC insurance, in 1996 and became CFO in 2002. McKenney also

served as CFO of Genworth from May 2004 until his resignation in August 2007, and was part of the

team that launched Genworth's initial public offering from GE.

26.     Defendant McGarry was the CFO and an Executive Vice President of Unum during

the Class Period, a position he has held since April 2015. As CFO, McGarry was responsible for the

overall financial management of the company, including financial reporting, treasury and capital

management, strategic planning and mergers and acquisitions, investments, financial planning,

investor relations, and enterprise risk management. McGarry is an actuary, a fellow of the Society of

Actuaries, and a member of the American Academy of Actuaries. McGarry first joined Unum in

1986 as an actuary. Since that time, McGarry has served in various positions, including as President

and CEO of Closed Block Operations, which includes Unum's LTC business, from 2012 to April 2015.

27.     Defendant Zabel was the President of Unum's Closed Block segment during the Class Period, a position he has held since July 2015. Previously, Zabel served as Senior Vice President and Chief Risk Officer since August 2013, where he was responsible for the oversight of Unum's enterprise risk management program. Before joining Unum, Zabel also worked at Genworth, most recently serving as Senior Vice President of Long Term Care Insurance.

28.     Defendant Daniel J. Waxenberg ("Waxenberg") has served as Senior Vice President and Chief Accounting Officer at Unum since February 2017. From July 2012 to February 2017, Waxenberg served as Vice President of Global Financial Planning. From August 2008 to July 2012, Waxenberg served as a controller.

29.     The Defendants referenced above in ¶¶25-28 are collectively referred to herein as the "Individual Defendants."

30.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Unum, were privy to confidential, proprietary information concerning Unum, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Unum, as discussed in detail below. Because of their positions with Unum, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that

the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence and did, to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Unum's business.

32. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports, presentations and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

33. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Unum's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Unum stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

- 9 -

34.     Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Unum securities.  The scheme: (i) deceived the investing public regarding Unum's business, operations and management and the intrinsic value of Unum securities; (ii) caused Plaintiff and members of the Class to purchase Unum securities at artificially inflated prices; and (iii) resulted in losses to Plaintiff and the members of the Class as it was disclosed, as alleged herein.

## IV.     SOURCES OF ALLEGATIONS

35.     Lead Plaintiff's allegations are based upon information contained in SEC filings by Unum, other regulatory filings and reports, government records and reports of Unum's operations, press releases and media reports about the Company, reports of securities analysts about the Company, transcripts of conference calls and analyst presentations by Unum or its officers and other reports of oral or written statements made by Defendants.  The allegations contained herein are also based upon an investigation conducted at the direction and under the supervision of lead counsel, including information obtained from state regulators and the National Association of Insurance Commissioners.

## V.     BACKGROUND

36.     Unum, together with its subsidiaries, provides a variety of insurance products.  The Company's product lines include disability, LTC, life, accident, critical illness, dental and vision insurance products, and other related services.  The Company primarily operates in the U.S. and the U.K.  In FY2017, Unum reported $11.3 billion in revenue, and $994 million in net income.  Of its $11.3 billion in revenue, $8.6 billion consisted of premium income, and $2.45 billion consisted of investment income.

37.     During and prior to the Class Period, Unum had four principal operating business segments: Unum US, Unum UK, Colonial Life and Closed Block.[2] For FY2017, the percentage of consolidated premium income generated by each reporting segment was: (i) Unum US – 63.3%; (ii) Unum UK – 6%; (iii) Colonial Life – 17.6%; and (iv) Closed Block – 13.1%. Within Unum's Closed Block, individual disability policies accounted for 42% of premium income, while LTC accounted for 58% of premium income.

38.     At all relevant times, Unum LTC portfolio consisted of both individual LTC policies and group LTC policies. Unum discontinued individual long-term care policies in 2009. Unum discontinued group long-term care policies to employers for the benefit of employees in 2012, other than features contractually allowable on existing group policies. As of June 2018, Unum LTC policies covered approximately 962,000 lives, approximately 15% of which were individual policies.

39.     In seeking to downplay the risks to its business, Unum repeatedly emphasized the prevalence of the group policies in its LTC block. For example, at the December 13, 2017 Unum Annual Investor Meeting, Zabel stated that Unum's block, "is a little unique in that so much of it is in the group space." Zabel went on to state:

> The group product sold in the group market, 2/3 of our product there is employer paid. So that has a couple of dynamics: one is, they usually come in at more of the base type of coverage, so the risk is going to be much lower. The other thing is when it's employer paid, you've got an entire employee base that's covered, which really helps with risk selection and really diversifies the risk within the group.

Individual policies, in contrast, were a "high-end product that has an average premium of around $2,000, it's what you might traditionally see in the market. Higher lifetime benefits on the product, a much higher monthly benefit and higher average benefit period." What Unum did not seek to

---

[2]     The Company also discussed a corporate segment, which includes investment income on corporate assets not specifically allocated to a line of business, interest expense on corporate debt other than non-recourse debt, and certain other corporate income and expense not allocated to a line of business.

highlight, however, was that while individual policies made up only 15% of Unum's LTC portfolio, they represented the vast majority, almost 80%, of claims incurred.

## A.    Background of LTC Coverage

40.    LTC insurance is intended to protect consumers from the high cost of home care, assisted living care, adult day care, respite care, hospice care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living.  These costs are typically not covered by health insurance, Medicare, or Medicaid.

41.    Insurance companies, including Unum, priced LTC insurance premiums based on four primary assumptions: (i) mortality rates (how long individuals who have policies are expected to live, pay premiums, and collect benefits); (ii) lapse rates (how many insureds will stop paying their premiums and let their policies terminate); (iii) morbidity rates (the chance someone will develop a condition requiring LTC); and (iv) interest rates (the rate of interest income earned on reserves held against premiums collected).

42.    Companies began marketing and selling LTC insurance in the 1970s.  At that time, among other factors, insurers modeled LTC insurance pricing after Medicare supplement policies, which projected high policyholder lapse rates, favorable interest rates, and assumed mortality and morbidity rates beneficial to insurance providers.  These assumptions projected that LTC insurers would pay less in claims than the capital they accumulated from premium payments, and fueled a boom in the industry.  By the end of the 1990s, more than 100 insurers sold LTC insurance.  At the peak of the LTC market in 2002, these companies wrote approximately 750,000 new policies annually.  By 2012, over 7.3 million people had in-force LTC policies.

43.    However, LTC insurers discovered that the major pricing assumptions that fueled the expansion of the LTC market in the 1970s and 1980s were woefully inaccurate.  Specifically,

- 12 -

insurers had greatly overestimated expected lapse rates and interest rates, and had dramatically underestimated the number of policyholders that would file claims and the length of time such claimants would require benefits.

44.     For example, insurers initially assumed that 8% of policyholders would let their policies lapse within one year, with an additional 4% thereafter.  In practice, only 4% let their policies lapse in the first year, and just 0.5% thereafter.  Indeed, voluntary lapse rates for LTC policies are lower than for any other insurance product.  In addition, by 2007, insurers had reduced their assumptions for mortality rates by 10% compared to the assumptions that were used to price LTC policies in 2000, and by 2014 those rates had been reduced by an additional 20%.  Likewise, morbidity rates in 2014 were between 15 to 45% higher than they were in 2000.  During this same time period, interest rates were 2 to 4%, far lower than the 3 to 8% assumed by insurers.

45.     LTC insurers' use of flawed assumptions to price LTC policies meant that they had significantly underestimated the extent of their liabilities under these policies.  Each of these miscalculations negatively affected an insurer's ability to make payments due under the policies and consequently, subjected insurers to large losses on their LTC exposure.  These miscalculations led most insurers, including Unum, to abandon writing new LTC policies prior to the Class Period.  By 2014, less than 15 companies sold standalone LTC policies.  Nevertheless, many insurers, like Unum, still faced massive liabilities from their existing LTC portfolios.

46.     To ease the pressure on their bottom lines caused by long-term care policies, many insurers, including Unum, sought to obtain approval for massive premium rate increases from state insurance regulators, with mixed success.  These increases, however, were generally insufficient to reach profitability for their older, more generous policies.  As a result, insurers have been forced to increase their LTC-related reserves by billions of dollars in charges over the last decade.

47.    For instance, in November 2014, Genworth reported that as a result of a review of its LTC disabled life reserves, it was under-reserved by $531 million, primarily because it had calculated reserves based on a claim duration – *i.e*., the average length of time that policyholders are in nursing homes or receiving other long-term care – that was far shorter than the Company's contemporaneous data showed.  According to a subsequently filed lawsuit, which was recently settled for $219 million, Genworth had secretly used out-of-date claims data, including a claim duration of 2.2 years, when setting reserves, while using a longer, more accurate duration of approximately three years when it suited them for other purposes, such as marketing or lobbying regulators to increase rates.

48.    In January 2018, GE announced that, based on reserve testing primarily on its LTC portfolio, its financial services subsidiary would have to take a pre-tax charge of $9.5 billion ($6.2 billion after tax) for 4Q2017 and was expected to make statutory reserve contributions of $15 billion over the next seven years.  A Bloomberg article described GE's woes as "14 years in the making," and its massive reserve increases have led to civil and criminal investigations by the SEC and DOJ, both of which remain ongoing.

49.    Because of these, and another well-publicized problems facing LTC insurers, Unum's LTC business, and its reserves and liabilities related thereto, were of singular concern to Unum investors before and during the Class Period.  As Tom White, Unum's Senior Vice President of Investors Relations ("White") admitted on March 11, 2015: "there's been more focus than we'd like to talk about on the long-term care business . . . we feel like we've dealt with the reserve issue on long-term care and we can get the focus back to the core businesses which are ones as Tom described have great growth potential."  On April 30, 2015, shortly after Unum announced its $698 million pre-tax reserves charge, McKenney further clarified that Unum not only wanted to take investors' focus off of the LTC products but also to get rid of the business altogether.  He stated:

[W]hat are the actions we can take around our closed block which does consume roughly a third of our capital at lower returns. . . . The reality of the situation with the closed block is we would like to take actions to alleviate some of the size of our closed block, particularly the long-term care business we have today. The markets are not that conducive to helping us to do that.

**B.     In December 2014, Unum Announces a Comprehensive Review of its LTC Reserves**

50.     In December 2014, Unum announced that it was in the process of completing a review of its LTC reserves, and that it anticipated taking a pre-tax charge in 4Q2014 of $600 to $800 million.  During an investors meeting, while McGarry claimed that Unum had updated every assumption supporting the LTC reserves, it was low interest rates which were purportedly the driver of the charge.  McGarry assured investors that the reserves were adequate, that the underlying assumptions were solid and durable, and that Unum would continuously ensure that the assumptions stayed current with claims experience.

51.     Analysts sought clarity around the assumptions, but Defendants consistently refused to provide the necessary details for each assumption.  For example, one analyst inquired as to the assumptions to watch to determine "whether there is going to be a need for another reserve charge like one, two, three years down the road. Obviously interest rates is one, price hikes is another one but what is going on in terms of incidents, trends, claims severity, claims frequency?"  In lieu of providing details to each of the assumptions, McGarry pointed analysts to the interest adjusted loss ratio and stated: "I think longer-term we expect the long-term care loss ratio to hover in that 85% to 90% range. I think if it were outside of that range for a prolonged period of time, it would begin to put pressure on the reserve assumptions."  Another analyst asked about the worsening claims trend in the industry and what Unum did to adjust for that development.  McGarry bluntly responded that "we are not going to go through in great detail kind of the puts and takes" but admitted that Unum was not "completely inconsistent with" industry trend.  However, rate increase prospects "offset a lot of that."

52.     Two areas that McGarry did provide clarity on were rate increase assumptions and the abundance of claims experience data relating to the individual LTC business which Unum relied on when setting assumptions.  On rate increases, McGarry stated that Unum assumed that it will achieve "a similar level of success" on 2014 rate increase requests as the Company had achieved in the several years prior to the 2014 filings.  With respect to the individual LTC business, McGarry assured that "[w]e have a lot of claim data on the individual side and so we rely pretty heavily on that. We were informed by industry data . . . ."

53.     Analysts came out of the meeting relieved that Unum had bucked industry trend on worsening assumption developments and relied on its own claims experience data to come up with assumptions, particularly for the individual LTC product.  For example, Deutsche Bank emphasized management's assurance of: (1) "its filed pricing increases offset these [worsening trend] results;" (2) Unum "relied more heavily on its own data, particularly for the individual long-term care book, when updating its assumptions;" and (3) its expectation of "maintain[ing] an 85 to 90 percent interest-adjusted loss ratio."  Morgan Stanley stated:

> Headed into the meetings, all eyes were on the long-term care review . . . .  Based on comments by management, it appears the assumptions regarding lapses, claims rates, and claim severity had little impact on reserves, which was a relief given the adverse trends that have emerged at some of its peers in recent quarters.

>                    *        *        *

> [W]ith the overhang from the LTC reserve review now largely out of the way, the stock stands to benefit near-term.

54.     Relief was illusory.  Shortly after the December 2014 comprehensive review, actual experiences relating to rate increase approvals and the individual block's lapse rate, claims incidents, and incurred claims amounts all deviated from assumptions – suggesting that the assumptions were problematic and not actually based on Unum's experience data.  Although Defendants repeatedly assured investors that Unum monitored actual experience monthly to ensure consistency to

assumptions, they concealed the fact that they had been allowing deviations from expectations to persist year after year – particularly in the rate increase requests and the individual block – without adjusting assumptions and replenishing reserves. Ultimately, the effects of deviations from assumptions built up, knocked the interest adjusted loss ratio out of guidance's range for multiple quarters, and caused reserves to be severely underfunded. Unum finally took another $750 million pre-tax reserves charge in 3Q2018, leading to a net loss of $285 million for the quarter.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

55. Before and during the Class Period, Defendants made materially false and misleading statements and omissions regarding the Company's LTC business, as well as the sufficiency of the Company's LTC reserves, artificially inflating Unum's stock price. These statements and omissions included: (i) assuring investors that Unum was on track in achieving rate increases from state regulators consistent with its reserve assumptions, when in fact increases were being delayed, denied, and reduced; (ii) touting the prevalence and conservative nature of Unum's Group LTC policies while failing to disclose the disastrous performance of Unum's individual policies which accounted for the vast majority (close to 80%) of Unum's insured claims; (iii) misleading investors that the heightened loss ratio was due to unusual or short term activities, and disguising the pervasive problem of actual experiences deviating from assumptions stating that experiences were on track as evidenced by the loss ratio; and (iv) falsely claiming that it had closely and frequently monitored emerging experiences, that experiences were tracking with assumptions, and that Unum's LTC reserves were adequate.

### A. Materially False and Misleading Statements and Omissions Concerning LTC Rate Increases

56. Defendants made materially false and misleading statements and omissions concerning Unum's progress and success at achieving rate increases from state regulators.

- 17 -

Defendants represented to investors that the rate increase assumptions embedded in its reserves were based on Unum's historical experience attaining rate increases prior to 2014. And throughout the Class Period, Defendants repeatedly assured investors that Unum was on track or making significant progress against assumptions. In truth, by the beginning of the Class Period in October 2016, Unum's rate increase requests in a vast number of states were met with disapprovals, approval delays, phase in requirements, and implementation delays – resulting in rate increases significantly below the Company's historical experience and assumptions in its reserves.

### 1. Pre-Class Period False Statements and Omissions Concerning LTC Rate Increases

57. On February 3, 2015, Unum filed its 4Q2014 Form 8-K, where Unum Group's then President and CEO Tom Watjen ("Watjen") stated: "*Our top line growth was driven by a balance of strong sales results, solid persistency and continued success with our ongoing renewal and re-pricing actions.*"

58. On April 30, 2015, Unum hosted its 1Q2015 earnings call with participation by McKenney and McGarry. In response to analyst's question concerning Unum's rate increase progress, McGarry emphasized that he was "very pleased with the progress" and "very comfortable with where we are and very comfortable with the assumptions . . . around rate increases":

> [Jimmy Bhullar – Analyst – JPMorgan:] [J]ust on long-term care, your progress on raising prices in the block and the possibility of addition to stat reserves.
>
> *        *        *
>
> [McGarry:] Yes. *Long-term care, we're very pleased with the progress we're making on the rate increase front.* As we mentioned, we filed a rate increase request with enhanced options for people to basically buy out of the rate increase by reducing their inflation percent in their contract. That has been very well received by regulators. We're seeing good success in getting approvals for that and actually will be looking for. We haven't sent out our first option to policy holders, but *we're very comfortable with where we are and very comfortable with the assumptions we've put into the reserve assumptions around rate increases.*

1519354_1

59. On the same day, Unum filed a quarterly report on Form 10-Q announcing its financial and operating results for 1Q2015 (the "1Q2015 Form 10-Q"). The Form 10-Q contained signed certification pursuant to SOX by Watjen and McGarry stating that the information contained in the 1Q2015 Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

60. In each of the 1Q2015 Form 10-Q, 2Q2015 Form 10-Q (signed and certified by McKenney and McGarry on July 30, 2015), 3Q2015 Form 10-Q (signed and certified by McKenney and McGarry on October 29, 2015), 1Q2016 Form 10-Q (signed and certified by McKenney and McGarry on April 28, 2016), 2Q2016 Form 10-Q (signed and certified by McKenney and McGarry on July 28, 2016) filed prior to the Class Period, Unum made substantially similar representations that long term care rate increase was the mitigating factor in the Closed Block and a core part of its segment outlook:

> *Premium income for long-term care increased slightly due [to rate increases and stable persistency]. We continue to file requests with various state insurance departments for premium rate increases on certain of our individual and group long-term care policies. The rate increases reflect current interest rates and claim[] experience, higher expected future claims, longevity, persistency, and other factors related to pricing long-term care coverage. In states for which a rate increase is submitted and approved, we routinely provide customers options for coverage changes or other approaches that might fit their current financial and insurance needs.*

*   *   *

Segment Outlook

> We intend to continue our focus on operational effectiveness, rate increases, enhancement of our experience analysis tools, and capital management. We expect operating revenue to decline over time as these closed blocks of business wind down, *although we anticipate additional premium income associated with long-term care rate increases*.

61.     On September 9, 2015, McGarry participated in the KBW Insurance Conference. During the conference, he touted Unum's success in obtaining rate increase approvals and that such approvals were in line with assumption embedded in the reserves:

> [Unidentified Participant:] Can you just – because there's a lot of different assumptions cited from companies, just review what you're assuming for premium rate increases within your reserves?
>
> [McGarry:] In the reserves, we assume rate increases on – we only looked at filed rate increases. So there weren't any future filings that we anticipated. *Within rate increase request that we had filed in the states, we looked at our historical experience in terms of our success with states, and went actually state by state in looking at that to make the assumption. Our results thus far have been in line to slightly positive relative to those assumptions. We have a lot of those request already approved. So we feel pretty good about where that assumption is.*

62.     On December 17, 2015, Unum hosted its annual investor meeting with participation by McKenney and McGarry. During the meeting, McGarry falsely claimed that rate increases for both individual and group blocks were met with "consistent success":

> [McGarry:] The strategy of the closed block is the same. *We're going to continue to focus on rate increases. We've made good progress with the states and expect that to continue.* We need to remain diligent about being effective and efficient in managing it.
>
>                      *       *       *
>
> [Sydney Cowen – Analyst – UBS:] And then can you give us a sense – I think you gave it to us on a consolidated basis for the cumulative price increases in the LTC. But can you give us a sense of how individual compares to group?
>
> [McGarry:] It would be hard to say even how you would do that, whether it is a percent rate increase. *I would say, overall, though, we have had pretty consistent success in both lines. I mean, we are in our third round of rate increases on the individual long-term care business. It is the winning spot option. It has been very successful. But we were very successful on our last round of significant rate increases on the group long-term care business.*

63.     On February 3, 2016, Unum hosted its 4Q2015 earnings call with participation by McKenney and McGarry. During the call, McGarry reiterated that rate increases were within

expectation with "positive tone" from regulators, and "both the rate of approvals and the actual implementations" were "in line" with reserve assumptions:

> [McGarry:] Regarding the reserve position for long-term care, we feel good about where we finished 2015 in terms of reserve adequacy. For the year, our new money yields exceeded our interest rate assumptions and risk results remained within our long-term expectations. ***In addition, rate increase approvals and implementation are tracking in line with our reserve assumptions.***

> \*        \*        \*

> [Jimmy Bhullar – Analyst – JPMorgan:] Okay. And then on long-term care, obviously rates are challenging, but how are the other things going like [claim trends], your success in achieving price hikes versus what you might assumed when you took the reserve charge in the fourth quarter of 2014?

> [McGarry:] Yes. ***So actually since we took the charge in 2014, things have been pretty much in line with our expectations. There's been some volatility quarter-to-quarter. But claim trends has stayed in that range at the 85% to 90% loss ratio. And we continue to make good progress on our rate increase assumptions. So both the rate of approvals and the actual implementations are pretty much in line with the underlying reserve assumptions.***

> \*        \*        \*

> [Michael Kovac – Analyst – Goldman Sachs:] And then switching gears a little bit, thinking about the environment for rate increases in long-term care, it sounded like it came in sort of in line with your expectations. Are you seeing any change in tone from regulators as we continue to be in a low interest rate environment, both in terms of your position in the market and in terms of seeing some other companies maybe reconsider whether they are writing new business in long-term care?

> [McGarry:] Yes, ***I think we continue to see a positive tone from regulators. It's certainly better today than it was three or four years ago. Even some of the late adopter states like New York are – seem to be coming along in considering rate increases in a different light, given the environment. So I think it continues to get better over time.***

64.     On February 10, 2016, McKenney participated in the Bank of America Merrill Lynch 2016 Insurance Conference. During the conference, he answered investor's questions concerning LTC rate increases and again reassured investors that Unum's price increase process with the states had "gone pretty well" and the Company was achieving the level of rate increases assumed in the reserves:

[Unidentified Participant:] You mentioned going out to the market and getting price increases. What's been the success in being able to get, we ask for price increases and what's spilled into your margins in terms of future assumptions?

\*      \*      \*

[McKenney:] So it's not just one whole holistic move, it's actually a look policy by policy, book by book and talk to regulators about what's the appropriate pricing on that. ***And so that process has gone pretty well. We're achieving what we expected as part of our reserving process.***

65.     On April 28, 2016, Unum hosted its 1Q2016 earnings call with participation by McKenney and McGarry. During the call, in response to analyst's question on the progress of rate increases, McGarry proceeded to paint a misleadingly favorable picture of the rate increase progress and environment:

[Michael Kovac – Analyst – Goldman Sachs:] And then shifting gears, on the long-term care business can you give us a sense of any of the progress you've made on rate increases in terms of filings, the percentage of approvals and, potentially, price increases relative to the requests that you've made?

[McGarry:] Yes, ***we continue to make significant progress on rate increases. We had built assumptions about the approvals we would get into our reserve assumptions when we took the charge in 2014. Our experience has been very consistent, or maybe slightly favorable to that.***

***We think the market for rate increases is actually continues to improve. More and more the states that aren't allowing rate increases are becoming the outliers, as opposed to the states that are. So, we feel good about where we are, we feel good about our assumptions and we feel good about rate increase prospects going forward.***

66.     On July 28, 2016, Unum hosted its 2Q2016 earnings call with participation by McKenney and McGarry. During the call, McGarry again falsely claimed that Unum was making "good progress on achieving rate increases" and the price increase hearings in various states had been "successful" and "positive":

***I'm pleased that we continue to make good progress on achieving rate increases in our in force long term care business.***

\*      \*      \*

[Humphrey Lee – Analyst – Dowling & Partners:] Florida recently announced they're going to do another public hearing for Long-Term Care increase. Seems to be following Pennsylvania's footsteps.

Do you expect more of these kind of hearings from regulators as they try to strike a balance between protecting consumers and keeping the LTC business viable? And how do these kinds of hearings affect some of your rate increase decision going forward?

[McGarry:] You know, *in general these hearings have been positive for rate increases.* I know Pennsylvania held the hearings, they approved the rate increase shortly thereafter. There was a successful hearing in Massachusetts. Maine actually held a hearing, was one of the first. So we're happy to attend those hearings. We're really engaged in them. We have a very good story about where our block is, the reasons we're chasing, that we're pursuing rate increases, the justification for them. You know I think the fact that we're not trying to restore original pricing profitability into the block, that we're pursuing a sustainability strategy resonates well.

67.     On September 7, 2016, McKenney participated in the KBW Insurance Conference. During the conference, in response to analyst's questions concerning progress of rate increase approvals, McKenney misrepresented that rate increases were "tracking very well" to expectations:

[Ryan Krueger – Analyst – Keefe, Bruyette & Woods, Inc.:] Then moving to long-term care, can you review how the claim trend and also your rate increase approvals have gone since you took a charge in 2014 and laid out some updated assumptions?

[McKenney:] Sure. *Back in 2014, we set out a series of expectations around rate increases we would have over the next several years. I would tell you it was tracking very well to our expectations.* I think it's something that we work very hard at to make sure we are working with our customers and our regulators to make sure that process is well-orchestrated and makes sense, and so I think the team that's working on that has done a good job.

### 2.     Class Period False Statements and Omissions Concerning LTC Rate Increases

68.     On October 27, 2016, the Company hosted its 3Q2016 earnings call with participation by McKenney and McGarry. During the call, McGarry misled investors about Unum's progress of achieving rate increases and boasted that rate increases achieved to date will buffer reserves from "future adverse claims experience":

[McGarry:] *I continue to be pleased with the progress we are experiencing on achieving rate increases* on our in-force long-term care business.  In addition to *making good progress with state regulators and receiving several new rate increase approvals this quarter*, we are continuing to see strong take-up of the landing spot option.  *The landing spot has the same positive impact on reserves as rate increases but also has the added benefit of derisking the portfolio.  Since future claims will be smaller under the landing spot, the reserves will be somewhat less sensitive to future changes in reserve assumptions*.

\*       \*       \*

[Bob Glasspiegel – Analyst – Janney Montgomery Scott:] I'm just curious if you had any reactions to Genworth's series of announcements, specifically the charge for long-term care related to more longer-duration claims, which I think you've commented you've been seeing to some extent.  But are they ahead or behind the curve in your view, and do you have a rooting interest on the success of their actions and any general commentary on their strategic move would be appreciated?

\*       \*       \*

[McGarry:] *In 2014 we reset reserve assumptions.  We placed those reserve assumptions on a best estimate basis using our current own experience, and our experience since then has been consistent with those expectations*.

*We also established – when we establish[ed] those reserves, we built in currently-filed rate increases using historical approval rates.  Less than a third of those rate increase assumptions remain outstanding.  We are making significant progress against them and feel very good about where the assumptions lie with only a small portion remaining*.

*That not only helps to support our reserve assumptions, but it also gives us room in the future to react to future adverse claims experience should it emerge.*

69.     During the Class Period, in each of the (1) 3Q2016 Form 10-Q (filed on October 27, 2016); (2) 1Q2017 Form 10-Q (filed on April 27, 2017); (3) 2Q2017 Form 10-Q (filed on July 28, 2017); and (4) 3Q2017 Form 10-Q (filed on October 26, 2017), McKenney and McGarry signed and certified that the information contained in the filings was accurate and disclosed any material changes to the Company's internal control over financial reporting.  Waxenberg also signed the 1Q2017 Form 10-Q, 2Q2017 Form 10-Q, and 3Q2017 Form 10-Q.  In all of the Form 10-Q filings, Unum highlighted LTC rate increases as the mitigating factor in the Closed Block and a core part of its long term care segment outlook:

- 24 -

*Premium income for long-term care increased [slightly] due [primarily] to rate increases. We continue to file requests with various state insurance departments for premium rate increases on certain of our individual and group long-term care policies. The rate increases reflect current interest rates and claims experience, higher expected future claims, longevity, persistency, and other factors related to pricing long-term care coverage. In states for which a rate increase is submitted and approved, we routinely provide customers options for coverage changes or other approaches that might fit their current financial and insurance needs.*

70. On December 15, 2016, Unum hosted its annual Investor Day with participation by McKenney, McGarry, and Zabel. During the Company's presentation to investors, Zabel misled investors by stating that the "impact of the our premium rate increases" was "right on top" of expectations:

> [Zabel:] If you bring that back and just think all in how we're doing, *we are really right on top of how we thought about the impact of our premium rate increases and our original reserve assumptions. So we feel really good about the progress we have made there*.

71. On February 2, 2017, the Company hosted an earnings call to discuss its fourth quarter and full year 2016 financial results, with participation by McKenney and McGarry. During his prepared remarks, McGarry again touted Unum's rate increase achievements and falsely stated that the Company "made good progress against the assumptions" used in the reserves:

> I continue to be pleased with the progress we're making in the Closed Block, particularly in the long-term care line. The yields achieved on new money for the long-term care business have consistently exceeded the assumptions we have built into our reserves. Also, *we continue to make good progress in achieving rate increases in our in-force long-term care business*.
>
> *We received some notable approvals recently and continue to make good progress against the assumptions we used in our reserves.*

72. On February 22, 2017, Unum filed an annual report on Form 10-K with the SEC, which contained signed certifications pursuant to SOX by McKenney and McGarry stating that information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting (the "2016 Form 10-K"). In the 2016 Form 10-K, Unum discussed rate increase assumptions underlying the 2014 LTC reserves increase and

- 25 -

obtaining approvals from state regulators – without disclosing the pressures on reserves and loss

ratio from approval delays and the requirement to phase in rate increases over time:

> *Our sound and consistent business practices, strong internal compliance program, and comprehensive risk management strategy enable us to operate efficiently as well as to identify and address potential areas of risk in our business.*

> *. . . [W]e intend to continue protecting our solid margins and returns through our pricing and risk actions.*

\*      \*      \*

2014 Long-term Care Reserve Increase

\*      \*      \*

> *Included in our fourth quarter of 2014 review was an analysis of our reserve assumptions, including those for the discount rate, mortality and morbidity rates, persistency, and premium rate increases. . . .  Our premium rate increase assumptions were updated to reflect progress-to-date and our on-going rate increase strategy.*

\*      \*      \*

Operating Results

Shown below are financial results and key performance indicators for the Closed Block segment.

*(in millions of dollars, except ratios)*

| | 2016 | % Change | 2015 | % Change | 2014 |
|---|---|---|---|---|---|
| | | | Year Ended December 31 | | |
| **Operating Revenue** | | | | | |
| Premium Income | | | | | |
| Individual Disability | $ 521.9 | (8.8 )% | $ 572.4 | (8.4 )% | $ 624.8 |
| Long-term Care | 643.9 | 1.6 | 633.5 | 0.4 | 630.9 |
| All Other | 4.6 | 170.6 | 1.7 | 88.9 | 0.9 |
| Total Premium Income | 1,170.4 | (3.1 ) | 1,207.6 | (3.9 ) | 1,256.6 |
| **Total** | 2,608.6 | (0.3 ) | 2,616.9 | (0.5 ) | 2,629.9 |
| | | | | | |
| **Benefits and Expenses** | | | | | |
| Benefits and Change in Reserves for Future Benefits | 2,223.7 | (0.2 ) | 2,228.3 | (24.0 ) | 2,931.1 |
| **Total** | 2,479.1 | (0.7 ) | 2,497.8 | (22.1 ) | 3,208.1 |
| | | | | | |
| **Income (Loss) Before Income Tax and Net Realized Investment Gains and Losses** | 129.5 | 8.7 | 119.1 | 120.6 | (578.2 ) |
| Long-term Care Reserve Increase | — | — | — | — | 698.2 |
| **Operating Income** | $ 129.5 | 8.7 | $ 119.1 | (0.8 ) | $ 120.0 |
| | | | | | |
| Interest Adjusted Loss Ratios: | | | | | |
| Long-term Care | 91.1 % | | 87.6 % | | 196.6 % |
| Long-term Care Excluding the Reserve Increase | — % | | — % | | 85.9 % |

\* \* \*

<u>Year Ended December 31, 2016 Compared with Year Ended December 31, 2015</u>

*. . . Premium income for long-term care increased due to rate increases, partially offset by policy terminations. We continue to file requests with various state insurance departments for premium rate increases on certain of our individual and group long-term care policies. The rate increases reflect current interest rates and claim experience, higher expected future claims, longevity, persistency, and other factors related to pricing long-term care coverage. In states for which a rate increase is submitted and approved, we routinely provide customers options for coverage changes or other approaches that might fit their current financial and insurance needs*.

\* \* \*

<u>Year Ended December 31, 2015 Compared with Year Ended December 31, 2014</u>

*. . . Premium income for long-term care increased slightly due to rate increases and stable persistency*.

73.     On April 27, 2017, the Company hosted a conference call to discuss its 1Q2017 financial results with participation by McKenney, McGarry, and Zabel. During his prepared remarks, McGarry boasted that Unum was "making good progress on rate increase approvals." In

response to analyst's question about rate increase achieved relative to expectation, Zabel misrepresented that Unum was "still on track" even with some states imposing approval limits and spreading out increases over several years:

> [McGarry:] *We are also making good progress on rate increase approvals on our in-force business. This past quarter, we received several rate increase approvals. And though they tended to be in smaller states, we are tracking very well relative to the rate increase assumptions we've factored into our reserves. Our reserve assumptions only factored in rate increase requests related to our 2014 program.*

> \* \* \*

> [Ryan Krueger – Analyst – Keefe, Bruyette & Woods, Inc.:] And then on long-term care. It's when was – when did you model the 2014 rate increase program to be complete? And can you give us a sense on a cumulative basis how the rate increases have come in relative to your modeled expectation so far?

> [Zabel:] Yes, this is Steve, thanks for the question. *I would say the way to think about it is, it was modeled out over several years. And as you might expect, you're going to get probably a majority or significant part of that kind of early on within the first 2 to 3 years. But with some states, there is caps on the approval limits and those types of things. So those will be modeled over more years. I guess what I would tell just overall what we're still on track with what we put in our initial assessment within the GAAP reserve in 2014 and still really good about being able to achieve that level of rate increase.*

74.    A month later, on May 30, 2017, McGarry participated at the Deutsche Bank Global Financial Services Conference. During the conference, he touted Unum's progress in achieving rate increases and falsely stated that such increases served to "derisk the portfolio":

> [Yaron Joseph Kinar – Research Analyst – Deutsche Bank AG:] And you mentioned long-term care which is really the final issue I want to touch on before I open it up to the audience. So beyond looking to transact with third parties, are there actions that Unum can take unilaterally in order to derisk their portfolio or cordon it off?

> [McGarry:] So we're certainly – *every day, we do everything we can to derisk the portfolio. The major one there is rate increases. We've been very effective with rate increases. We built when we took our last reserve charge, a level of rate increases into that GAAP reserve assumption. We're 85% to 90% of the way toward having accomplished what was built in there and feel very comfortable with the achievability of the rest of it.* And we're not going to stop there just because we hit the GAAP assumptions. We'll continue to pursue justified rate increases beyond that.

- 28 -

75. On October 26, 2017, the Company hosted a conference call to discuss its 3Q2017 financial results, with participation by McKenney and McGarry. During his prepared remarks, McGarry falsely stated that Unum was "on pace to achieve, if not slightly exceed, the rate increase expectations assumed" in the reserves and assured investors that the Company's treatment of rate increases were always "consistent with the actuarial guidance":

> [McGarry:] Other important factors related to long-term care – to *the long-term care line continued to trend favorably this quarter*. Our new-money yield in the quarter was again above our 5% assumption, just as it has been since resetting of that assumption in the fourth quarter of 2014. In addition, *we continue to make good progress with rate increases on the in-force business, with several additional approvals, keeping us on pace to achieve, if not slightly exceed, the rate increase expectations assumed in our reserves. We continue to have productive discussions with our state insurance departments*, and it's worth noting that other than the small amounts outstanding from our 2014 filings, no future rate increases are built into our current reserve assumptions. With that said, we plan to actively pursue the future rate increases were justified.

*     *     *

> [Thomas George Gallagher – Analyst – Evercore ISI:] Actuarial Guideline LTC, any initial thoughts on impact for you or the industry related to that?

> [McGarry:] Yes. I can't talk for the industry. I don't anticipate any impacts for us. We've always tested our long-term care on a stand-alone basis. So that's nothing new for us. In addition*, our treatment of both rate increases as well as investment results have always been consistent with the actuarial guidance. We think it's positive that the guidance – we support the goal of having better consistency and clarity around actuarial matters, but we feel really good about where we are and don't anticipate any changes as a result.*

76. On December 13, 2017, Unum hosted its annual investor meeting with participation by McKenney, McGarry, and Zabel. During the meeting, Defendants eased investors' concerns about the elevated interest adjusted loss ratio by touting Unum's achieved rate increase and claimed that such increases served to offset reserve pressure caused by morbidity, mortality, and lapses. In addition, Zabel assured investors that states' requirement of phasing in rate increases over time had only "a little bit" of an effect in the loss ratio, premium will flow in "ultimately over time," and that Unum "fe[lt] really good about" the rate increases as it might even exceed the original assumption:

[McGarry:] *We've also made great progress on rate increases.* So we're basically pretty much through our rate increase assumption back in our 2014 reserves. What that means is *any additional rate increase approvals that we get or any future rate increase filings that we make can go toward offsetting some of that morbidity pressure as opposed to needing to fill in a hole that's already built into the reserve.*

\* \* \*

[Zabel:] The LTC premium is pretty much flat at this point. *We really see premium increases through our rate-increase strategy being offset by just normal decrements in the block, whether it's mortality or lapses.* We would anticipate that to continue over the foreseeable future in being a fairly flat premium block to maybe just a little bit increasing.

\* \* \*

*Key messages. We feel really good about our rate-increase strategy. We've achieved approvals between 85% to 90% of what our underlying GAAP reserve assumption is that we set back at the end of 2014. We really feel like we have a line of sight of being able to close that gap, and probably, even exceed the estimate that's built into our benefit reserve there*. . . .

*. . . Over the last year since we met last, we've had some success in some larger states that have historically been fairly difficult. Massachusetts, Florida and Hawaii was another state where we have a fairly large block. We have achieved significant increase approvals over the last year*. A lot of hard work there just working with the state. But also, *specifically in Florida and Massachusetts*, they had public hearings, which we think is actually fairly important to get the issue out there and meet with consumers, make sure that they understand what the issue is as the states go through their process to approve the rate increases. *Both of those increases will come in over time, though. That's one trend we're seeing quite a bit out there with the states is they may approve a significant increase, but they require us to lag into it over several years. What you'll find is that phasing in will create some short-term loss ratio pressure, even though, ultimately over time, that premium will begin flowing and we have seen that a little bit in our loss ratio.*

77. On February 1, 2018, the Company hosted a conference call to discuss its fourth quarter and full-year 2017 financial results, with participation by McKenney, McGarry and Zabel. During his prepared remarks, McGarry unequivocally expressed confidence in achieving the rate increase expectations – even if the remaining large rate increase requests were not approved:

[McGarry:] *[W]hile it's a quiet quarter for rate increase approvals on inforce business, we still have a few large rate requests yet to be decided. Even without these, we're confident we will achieve the rate increase expectations assumed in our reserve assumptions.* It bears repeating that we assume no future rate increases

in our current reserve assumptions, though we intend to actively pursue future rate increases where justified.

78.     On February 21, 2018, Unum filed an annual report on Form 10-K with the SEC,

which contained signed certifications pursuant to SOX by McKenney and McGarry stating that

information contained in the Form 10-K was accurate and disclosed any material changes to the

Company's internal control over financial reporting (the "2017 Form 10-K"). Defendant Waxenberg

also signed the Form 10-K. In the 2017 Form 10-K, Unum discussed its rate increase approvals

from state regulators – without disclosing the pressures on reserves and loss ratio from approval

delays and the requirement by regulators that increases be phased in over time:

> *Our sound and consistent business practices, strong internal compliance program, and comprehensive risk management strategy enable us to operate efficiently as well as to identify and address potential areas of risk in our business. . . .*
>
> *. . . [W]e intend to continue protecting our solid margins and returns through our pricing and risk actions.*

                           *        *        *

Operating Results

        Shown below are financial results and key performance indicators for the Closed Block segment.

*(in millions of dollars, except ratios)*

| | 2017 | % Change | 2016 | % Change | 2015 |
|---|---|---|---|---|---|
| | | | Year Ended December 31 | | |
| **Adjusted Operating Revenue** | | | | | |
| Premium Income | | | | | |
|   Individual Disability | $ 471.8 | (9.6 )% | $ 521.9 | (8.8 )% | $ 572.4 |
|   Long-term Care | 648.7 | 0.7 | 643.9 | 1.6 | 633.5 |
|   All Other | 8.7 | 89.1 | 4.6 | 170.6 | 1.7 |
| Total Premium Income | 1,129.2 | (3.5 ) | 1,170.4 | (3.1 ) | 1,207.6 |
| **Total** | 2,563.0 | (1.7 ) | 2,608.6 | (0.3 ) | 2,616.9 |
| | | | | | |
| **Benefits and Expenses** | | | | | |
| Benefits and Change in Reserves for Future Benefits | 2,191.8 | (1.4 ) | 2,223.7 | (0.2 ) | 2,228.3 |
| **Total** | 2,439.1 | (1.6 ) | 2,479.1 | (0.7 ) | 2,497.8 |
| | | | | | |
| **Adjusted Operating Income** | $ 123.9 | (4.3 ) | $ 129.5 | 8.7 | $ 119.1 |
| | | | | | |
| Interest Adjusted Loss Ratios: | | | | | |
|   Long-term Care | 91.1 % | | 91.1 % | | 87.6 % |

*     *     *

<u>Year Ended December 31, 2017 Compared with Year Ended December 31, 2016</u>

     *. . . Premium income for long-term care increased slightly due to rate increases.  We continue to file requests with various state insurance departments for premium rate increases on certain of our individual and group long-term care policies.  The rate increases reflect current interest rates and claim experience, higher expected future claims, longevity, persistency, and other factors related to pricing long-term care coverage.  In states for which a rate increase is submitted and approved, we routinely provide customers options for coverage changes or other approaches that might fit their current financial and insurance needs*.

*     *     *

*Long-term care benefits experience was consistent with the prior year as unfavorable policyholder terminations, due primarily to mortality experience, offset by the impact of a large group case moving to an individual policy ported status during 2016.  Also impacting benefits experience relative to 2016 was unfavorable mortality experience in our group pension product*.

*     *     *

<u>Year Ended December 31, 2016 Compared with Year Ended December 31, 2015</u>

     *. . . Premium income for long-term care increased due to rate increases, partially offset by policy terminations*.

*     *     *

*Long-term care benefits experience was unfavorable relative to 2015 due to higher submitted claims as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016.*

79.     The statements referenced in ¶¶57-78 were materially false and/or misleading when made because, throughout the Class Period, Unum was neither making "significant progress" or "good progress" against assumptions, nor tracking "very well relative to the rate increase assumptions," or "on pace with our original assumptions."  The rate increases approved by state regulators were never "right on top of" or "on track with" assumptions embedded in the reserves in 2014 as vast numbers of Unum's requests were disapproved, met with approval delays, approved with phase in requirements and/or encountered implementation delays.

80.     In each quarter during the Class Period, Defendants updated investors concerning the progress of achieving rate increases but concealed the fact that its rate increase requests had run into myriad problems.  By the beginning of the Class Period in October 2016, Unum was already vastly underperforming in its rate increase progress compared to its historical experience.  Furthermore, significant numbers of rate increases approved by October 2016 and before the end of the Class Period came in less than historical experience, were required to be phased in over a number of years and faced significant implementation delays.  This underperformance continued throughout the Class Period.  As shown in the table below, problems of non-approvals, approval delays, phasing-in requirements and rate increase implementation delays infested Unum's requests for at least 25 states – in contrast to Unum's historical experience:

| | | 2014 Earned Premium ($mm) | 2014 Rate Increase Request Results (compared to historical) |
|---|---|---|---|
| | **States with Rate Increase Results Inconsistent with Historical Results** | | |
| 1 | Alabama | $4.3 | 20% increase (vs. 23% historical) and approval delay (3x longer than historical/10.8 months delay) |
| 2 | Colorado | $5.7 | Implementation delay (2x longer than historical/6.5 months delay) |
| 3 | Delaware | $1.0 | Implementation delay (2x longer than historical/10.9 months delay) |
| 4 | Florida | $21.5 | Required to Refile |
| 5 | Georgia | $15.7 | 10% increase (vs. 15% historical) and approval delay (2x longer than historical/5.1 months delay) |
| 6 | Hawaii | $17.4 | 1.4% increase (vs. 16% historical) and approval delay (3x longer than historical/25 months delay) |
| 7 | Idaho | $0.6 | Implementation delay (2x longer than historical/15.2 months delay) |
| 8 | Iowa | $3.4 | Phased-in over 3 years |
| 9 | Illinois | $17.8 | Phased-in over 3 years |
| 10 | Louisiana | $3.7 | Approval and implementation delay (3x longer than historical/19.5 months delay) |
| 11 | Maine | $9.9 | Approval delay (2x longer than historical/4.1 months delay) |
| 12 | Massachusetts | $34.7 | Phased-in over 4 years and approval delay (29.4 months delay) |
| 13 | Minnesota | $9.0 | Disapproved / Phased-in over 3 years |
| 14 | Mississippi | $2.2 | Approval delay (9.9x longer than historical/15.7 months delay) |
| 15 | Missouri | $13.3 | Approval delay (2.6x longer than historical/8 months delay) |
| 16 | Montana | $2.5 | Disapproved / 2.4% - 10.5% increase (vs. 22% historical) and approval delay (5x longer than historical/6.9 months delay) |
| 17 | North Carolina | $12.1 | Disapproved / Phased-in over 3 years |
| 18 | North Dakota | $0.4 | Implementation delay (2x longer than historical/12.1 months delay) |
| 19 | New Jersey | $26.6 | Phased in over 5-6 years |
| 20 | Nevada | $2.3 | Phased-in over 3 years and approval delay (2.5x longer than historical/4.7 months delay) |
| 21 | Tennessee | $12.8 | Phased-in over 3 years |
| 22 | Texas | $28.8 | Req. to Refile |
| 23 | Virginia | $15.1 | Approval delay (2.5x longer than historical/13 months delay) |
| 24 | Washington | $19.1 | Phased-in over 3 years and approval delay (2x longer than historical/5.7 months delay) |
| 25 | West Virginia | $1.7 | Phased-in over 3 years |
| | **Total Premium from Affected States:** | $281,406,678 | |
| | **% of Total Unum Earned Premium:** | 53% | |

81.     Premiums from these 25 affected states represented close to 53% of Unum's 2014 earned LTC premium.  For example, as shown in the table, Montana's rate increase approval process for Unum's 2014 requests took five times longer than historical approval time for prior requests, causing a seven-months delay.  Furthermore, the state disapproved some of Unum's 2014 requests and approved only 2.4% to 10.5% rate increases for certain requests – in contrast to the 22% increase achieved for Unum's pre-2014 requests.  For some states, such as Delaware, even though Unum achieved the desired rate increase, implementation of the increase took twice as long as historical experience – causing almost 11 months delay before Unum realized the benefit of the increased premium.

82.     At the end of the Class Period, during the May 2, 2018 earnings call, McGarry admitted as much, stating that the Company had "not received approvals as quickly as originally

estimated, and those approvals received had been phased-in over a longer time period than originally anticipated. [As a result, t]his had had the effect of increasing our reported loss ratio in the recent past by 3% to 4%." Consequently, Unum took a reserve charge to make up for the deficiency. As McGarry stated on May 30, 2018, "it's a current element, to the extent we do take our reserve charge and we update assumption[, t]hat would take care of that 3% as well."

### B. Materially False and Misleading Statements and Omissions Concerning the Group and Individual Policies

83.     Defendants made materially false and misleading statements and omissions concerning the true risk of Unum's LTC block by failing to disclose the deteriorating experiences in its individual block while simultaneously touting the group business as "low risk" with "conservative plan designs." By emphasizing its group business, and attempting to distinguish itself from Genworth, GE, and other LTC carriers who were being forced to increase their reserves, Defendants misled investors about the quality of its LTC block.

### 1. Pre-Class Period False Statements and Omissions Concerning the Group and Individual Policies

84.     On December 17, 2015, Unum hosted its annual investor meeting with participation by McKenney and McGarry. During the meeting, McKenney touted Unum's transparency as a Company – all the while McGarry distinguished the characteristics of the group block from the individual block while concealing that reserves for the individual block were already under heightened pressure and burdened with substantial risk:

> [McKenney:] **We think very much about being shareholder friendly and being transparent with our shareholders** and at the same time growing the Company.

*     *     *

> [McGarry:] **I'd like to give you a little background on the demographics of the block because it's significantly different than most of the long-term care blocks in the industry.** Our block is split about 50-50 from a premium perspective between individual long-term care and group long-Term care. Lives are almost 20/80. So we have over 800,000 group long-term care lives in the block. **We only have 158,000**

*individual long-term care lives despite the fact that they generate the same premium. The reasons for that, one, is the age of the block. So the attained age and the individual long-term care block is 70. It's only 51 in the group block.* There are still active participants and employers coming into that group long-term care block. *The nature of the benefits is very different too. There's only – there's 40% lifetime benefits in the individual block, less than 5% lifetime benefits in the group block.*

Most of our group block, most of those 850,000 lives are employer paid business. So when we sign up a group for long-term care, we would generally convince a small to mid-case employer to buy a very small piece of coverage – $1,000, $2,000 benefit, three-year benefit, on all of their employees. Since the employees were young, it was a very low cost to do that. And then we would go in and enroll voluntary buy-up coverages above that. So most of those 800 lives are employer paid, has different lapse experience underlying it because a lot of people don't bring that coverage with them when they leave an employer, different age experience and a very different mix of risk experience as well. And you can see that in the average premium. It's almost $2,000 for individual long-term care and only $400 for group. So a very different block, much more conservative plan designs, much different dynamic in terms of who is paying for it and a better experience underlying it.

\*       \*       \*

[Seth Weiss – Analyst – BofA Merrill Lynch:] If we think about the $8.5 billion of reserves and we look at the in-force premium split between individual long-term care and group long-term care, how do we think about the reserve split between that?

[McGarry:] Yes. *It is more heavily weighted to individual long-term care, in part because they have bigger premiums. It is an older block, so it is getting closer to win those benefits are actually going to be paid out. So that split is – and I am not sure exactly what the split is, but it is heavily weighted toward individual long-term care.*

[Seth Weiss:] And then along that, considering that individual larger untapped portion and obviously bigger reserve, but it is a more mature block, if we think about the sensitivity to assumption changes, be it mortality, be it interest rates, to group versus individual, I am just trying to qualitatively understand the sensitivity where you have a much bigger reserve in individual, but that is a much more mature block. Is that going to be much more sensitive to assumption changes?

[McGarry:] *That mature block, it tends to be more sensitive, in part because more of the world is behind you. So if benefits change, our ability to change premiums going forward relative to that mature block. The other thing that makes it more sensitive is just it has much higher persistency experience relative to the group life block. So you would expect more people to get out to claim on that block. So it tends to be more sensitive than group.*

- 36 -

85. On February 10, 2016, McKenney participated in the Bank of America Merrill Lynch 2016 Insurance Conference. At the conference, he distinguished Unum's LTC book of business from other insurers by emphasizing the "dispersion of risk" in the group block and concealing the heightened risk imposed by the individual block. In addition, he falsely assured investors that actual experience in the individual line of business tracked expectations:

> [McKenney:] We're probably the larger writer of group insurance out there and it does have less features associated with. The benefit covers are roughly probably 60% of what you'd see in the normal individual policy. There are no lifetime benefits.
>
> The average length of benefit provided is 3 years, 3.5 years, something like that. So actually has a different dynamic and the employer actually has been providing a lot of funding for this as well. *So, roughly half of the policies out there have some sort of employer funded piece to it today, which gives you a good dispersion of risk that you see across that book of business.* So it is a little bit younger in terms of book, but that also gives us flexibility, time to continue to re-price, which is a very important piece of how we're managing our closed block, how we're managing long-term care. So that would be a business where we will continually be re-pricing to make sure that we're getting justifiable increases to those policies as well. *So, I think that's, it's half of our book today, it does look a lot different than the individual long-term care book that others are used to, but I think that's something we can manage as part of the whole thing.*
>
> *          *          *
>
> [Unidentified Participant:] And if you think about the individual business, perhaps little bit of a richer product, but I believe the majority of reserves support that. How do we think about the sensitivity to the individual business to experience coming in different than expected, [with] interest rates staying low?
>
> [McKenney:] So to give you a sense of that, in 2014 with a comprehensive review that we went through in the book *and we do this every year, we went through and we said most of our assumptions around that business is part of our 2014 review. So we are actually tracking all that experience to what we're seeing out there today in the experience in the book of business and so we've been tracking over the course of 2015 very closely to that.*

86. On June 1, 2016, McKenney participated in the Deutsche Bank Global Financial Services Conference. During the conference, McKenney emphasized the lower risk profile of the group policies while concealing that the risks of the individual policies had significantly risen:

1519354_1

[Yaron Kinar – Analyst – Deutsche Bank:] So if I look at the long-term care block, it's really – it's comprised two blocks for Unum, the group and the individual. I think in the past you've talked about the group being – having better characteristics. Maybe you can remind us what makes that a better block than the individual and what mitigating actions or characteristics you can put on top of that with the lower risk even for us.

[McKenney:] . . . Long-term care comprises two pieces, one is the individual business, which is kind of the traditionally-written through distribution, one-on-one type underwriting type process but then half of it is also the group business.

*So we have more policies actually on the group side*, because this was issued at the employer, generally the employer provided that coverage to their employees and so as a result of that, you had good spread of risk across the overall portfolio. The size – the benefit sizes are much smaller than you would see on the individual business. And so, *I think that from a risk mitigation perspective at day one as well as their spread of risk really helps a lot*.

Now, it's also a younger block of business. So we actually – as we think about price increases we have opportunity to continue to improve the profitability on that side of the business which is something we're actively working on across our entire long-term care block.

But probably more true along on the group side as well. *So, very different characteristics and how it's underwritten issued and how it behaves today*, but it's going to play out over a period of time in conjunction with those price increases that we talked about.

### 2. Class Period False Statements and Omissions Concerning the Group and Individual Policies

87. On October 27, 2016, the Company hosted its 3Q2016 earnings call with participation by McKenney and McGarry. During the call, McGarry distinguished Unum from other LTC insurers by boasting about the low risk profile of its group policies – without disclosing the heightened risk associated with Unum's portfolio of individual policies:

[Bob Glasspiegel – Analyst – Janney Montgomery Scott:] I'm just curious if you had any reactions to Genworth's series of announcements, specifically the charge for long-term care related to more longer-duration claims, which I think you've commented you've been seeing to some extent. But are they ahead or behind the curve in your view, and do you have a rooting interest on the success of their actions and any general commentary on their strategic move would be appreciated?

\*    \*    \*

[McGarry:] *[O]ur block's unique in the long-term care business, as approximately half of the block is group long-term care with employer funding and extremely conservative plan designs*.  And because of that group coverage and employer funding, most employees terminate their employer-funded coverage when they leave the employer.

As a result, our group long-term care has a lapse rate of closer to 10% versus a less than 1% lapse rate for most individual long-term care policies, and *our group long-term care has a substantially lower risk profile*.

88.     On December 13, 2017, Unum hosted its annual investor meeting with participation by McKenney, McGarry, and Zabel.  During the meeting, Zabel mischaracterized individual product as "very healthy high-end product" and again touted Unum as unique and the group product as low risk products:

[Zabel:] Just want to remind some of the demographics about the block. *Our block is a little unique in that so much of it is in the group space.*  So we like to show both the individual and the group LTC demographics here.  As you can see, the in-force premium is split out just about 50-50, but the vast majority of the in-force lives are in the group product line.  And really what's driving that is you can just see the average premium for the two.  *The individual product tends to be a very healthy high-end product that has an average premium of around $2,000, it's what you might traditionally see in the market.  Higher lifetime benefits on the product, a much higher monthly benefit and higher average benefit period.  The group product sold in the group market, 2/3 of our product there is employer paid.  So that has a couple of dynamics: one is, they usually come in at more of the base type of coverage, so the risk is going to be much lower.  The other thing is when it's employer paid, you've got an entire employee base that's covered, which really helps with risk selection and really diversifies the risk within the group.*

89.     On February 1, 2018, the Company hosted a conference call to discuss its fourth quarter and  full-year 2017 financial results, with participation by McKenney, McGarry and Zabel.  In response to analyst's question about the comparison of Unum to GE, McGarry reassured analysts and investors that Unum's LTC business was on substantially more stable footing than that of GE – which had recently taken a multibillion dollar reserve charge related to its LTC business.  McGarry again highlighted Unum's group block and its "conservative plan designs" – without disclosing the heightened risk profiles of the individual block:

[Ryan Krueger – Analyst – Keefe, Bruyette, & Woods, Inc.:] Given the significant magnitude of the GE Long Term Care reserve charge, could you discuss some of the key differences you see with your block versus theirs that give you more comfort with the reverse adequacy?

*        *        *

[McGarry:] *[W]e feel like we are in a very different place than GE is*.  First, I'd point out that *the blocks are very different*.  GE's block was a reinsured block, which removes them one step from the customer.  Our block was direct written.  So we directly control the underwriting and benefit guidelines in that block.  The other big difference is *85% of our insured lives are group long-term care.  They have a much younger profile.  They – and most of those actual group long-term care insureds are employer-funded as opposed to employee-funded, much smaller benefit levels, much more conservative plan designs.  The other – by comparison, the GE block was 100% long-term care and was a much older block than our block is.  Second, we've aggressively and actively managed our block over time.  Since – I know, we've had 10 full-time actuaries dedicated to the block since 2012 and for a period, I was one of them*.

90.     The statements referenced in ¶¶84-89 above were materially false and/or misleading when made because Defendants disguised the true risk of Unum's LTC block by failing to disclose the riskiness of the individual policies while  touting such policies as a "very healthy high-end product," and emphasizing the group policies as a "low risk" product.  In particular, Defendants concealed that the actual claims experience within the individual line had significantly deviated from Unum's assumptions.  In addition, Defendants' statements distinguishing Unum from other LTC market participants were also materially false and misleading as the Company's individual policies, which drove the bulk of the risks in the LTC block, actually had similar characteristics as other LTC carriers' policies.

91.     Defendants touted the uniqueness of Unum's LTC block as "so much of it is in the group space" despite the fact that Unum's reserves were driven by individual policies and risks of such policies dominated the Company's LTC block.  For example, Unum's individual policies generated close to 80% of the incurred claims in its LTC block:

| Percentage of Incurred Claims by Business Lines | | | |
|---|---|---|---|
| Incurred Year | Group | Individual | Total |
| 2014 | 20.8% | 79.2% | 100.0% |
| 2015 | 20.8% | 79.2% | 100.0% |
| 2016 | 20.4% | 79.6% | 100.0% |
| 2017 | 20.9% | 79.1% | 100.0% |

92.     Even though individual policies had been generating a substantial percentage of claims, Defendants emphasized the group policies instead to disguise the worsening trends experienced by the individual line.  In truth, actual results for individual policies deviated from assumptions with an increasingly adverse trend.  For example, with respect to policies that remained in force, many more individual policyholders retained their policies instead of allowing them to lapse in comparison to Unum's assumptions.  Because LTC is a lapse-driven business, policyholders' failure to terminate their policies has adverse effects on carriers' financials.  When policies terminate before claims are incurred, reserves set aside from prior premium payments can be released.  As such, the ideal scenario for Unum would be for policyholders to pay premiums, and terminate their policies without ever incurring claims.

92.     However, for Unum, the actual policy termination experience deviated from assumption consistently every year since 2014, when Unum reset its assumptions as part of its comprehensive review.  As a result, more individual policies failed to lapse and stayed in force each year – far exceeding expectations:



**Comparison of Unum's Individual LTC Actual Lives In Force to Expected Lives In Force**

Steepness = -4.5

Steepness = -4.7

24,345 or 23% Cumulative Actual Lives Exceeding Expected Lives Over 2014 Total Expected Lives

Actual Lives in Force

Expected Lives in Force

93.     As shown in the graph above, when Unum's assumptions were compared against actual experience in the individual block between 2014 to 2017, the actual number of policies outstanding declined slower than Unum's assumed rate of policy termination – resulting in a higher number of policies outstanding by the end of 2017.  This was evidenced both by (1) the sequentially higher number of actual policies outstanding relative to expectations through the years – indicative of policies terminating at a slower pace than assumed, and (2) the accumulation of more than 24,300 policies outstanding over Unum's expectation by the end of 2017.  These additional outstanding policies were 23% higher than Unum's expectation, generated significantly more incurred claims than expected, and severely pressured the LTC reserves.  *See* ¶¶147-155.

| Inforce Lives – Individual LTC | | |
|---|---|---|
| Incurred Year | Actual Deviating from Assumption | Cumulative Deviation |
| 2014 | 5% | 5% |
| 2015 | 6% | 11% |
| 2016 | 6% | 17% |
| 2017 | 6% | 23% |

94.     Accordingly, with more individual policies remaining in force and failing to lapse relative to assumptions, reserves were placed under tremendous stress as more claims were filed than expectations.  Indeed, between 2014 and 2017, $257 million more cumulative incurred claims were filed by individual policy holders than expectation:



95.     As shown in the graph above, when Unum's assumptions were compared against actual experience between 2014 and 2017, the actual claims experience built up faster than Unum's assumed rate of incurred claims increase – resulting in a higher amount of accumulated actual incurred claims by the end of 2017.  This was evidenced both by (1) sequentially less expected incurred claims relative to actual incurred claims – indicative of the expected claims amount

- 43 -

accumulating at a slower rate than that the actual claims amount, and (2) the accumulation of $257 million more actual claims over Unum's expectations by the end of 2017. This additional $257 million of unexpected claims severely pressured the LTC reserves. *See* ¶¶147-155.

96.     Even though Unum's overall claims experiences – driven by high-risk individual policies – were very similar to other LTC carriers, Defendants told investors that Unum was different from Genworth, GE and other players in the LTC market by touting its group policies and hiding the fact that its individual line of business had similar or worse risk characteristics than other carriers. On October 27, 2016, in distinguishing Unum from Genworth, McGarry stated: "And because of that group coverage and employer funding, most employees terminate their employer-funded coverage when they leave the employer." Similarly, on February 1, 2018, in distinguishing Unum from GE, McGarry again stated "[t]he other big difference is 85% of our insured lives are group long-term care. They have a much younger profile. They – and most of those actual group long-term care insureds are employer-funded as opposed to employee-funded, much smaller benefit levels, much more conservative plan designs." In truth, the remaining 15% of Unum's insured lives with individual policies (responsible for 80% of the claims) had unfavorable policy termination rates similar to or worse than other LTC market participants:

| Individual Market Actual Total Policyholder Termination Rates | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Genworth | John Hancock | North-western LTC | Trans-america | Bankers Life | Met Life | CNA | Mutual Of Omaha | Unum | Prudential |
| 2014 | 3.6% | 2.4% | 2.1% | 3.8% | 7.2% | 1.7% | 5.2% | 3.3% | 2.6% | 4.1% |
| 2015 | 3.2% | 2.2% | 2.1% | 7.0% | 7.4% | 1.9% | 5.1% | 3.1% | 2.8% | 3.0% |
| 2016 | 2.8% | 2.6% | 2.2% | 5.9% | 7.5% | 1.9% | 5.5% | 3.0% | 2.7% | 3.1% |
| 2017 | 2.7% | 2.7% | 2.3% | 4.4% | 7.1% | 1.8% | 5.9% | 2.6% | 2.7% | 3.5% |

97.     Indeed, Unum was most aggressive in its individual policies termination rate assumption – resulting in the highest actual-to-expected lives inforce in the industry. This means that Unum experienced more individual holders keeping their policies inforce than its expectation.

And when compared to other LTC carriers, Unum's actual experience vis-à-vis expectation was worse than its competitors in the industry:



98.    Defendants ultimately admitted that Unum's individual block was similar to other carriers. On May 30, 2018, while discussing GE's reserve charge, McGarry conceded:

If you compare GE to our old [ILTC] block, which was the block that was issued before 2004, our average reserve in that block is kind of orders of magnitude today, $50,000 per policy. That reserve will double per policy in the next 10 years. And so it's not on top of GE, but it's not inconsistent with GE, either when you take kind of a similar situated block.

99.    Indeed, it was pressure from the individual policies' actual experience, which deviated from assumptions, that ultimately led to the underfunding of reserves. *See* ¶¶ 146-155. McGarry admitted as much on June 12, 2018 when an analyst asked "[w]hen you kind of pass through the park and look at the reserve adequacy, is it really the individual side that's been causing that much problem or . . .?" McGarry responded "[y]es, . . . definitely," but nevertheless continued

1519354_1

to re-direct investors to the group block by emphasizing that even the group business was "different than other people's group blocks." Ultimately, regardless of the purported uniqueness of Unum's LTC group block, the individual block persistently caused Unum's claims experience to be worse than its assumptions, leading to the reserve inadequacy and inflated loss ratio. *See* ¶¶146-155.

### C. Materially False and Misleading Statements and Omissions Concerning the Interest-Adjusted Loss Ratio

100. Before and during the Class Period, Defendants made material misrepresentations and omissions that actual experiences were closely tracking reserve assumptions as evidenced by the interest-adjusted loss ratio staying within its expected range of 85% to 90%. Defendants failed to disclose that rate increases, lapses and incurred claims experiences persistently deviated from assumptions, which imposed significant pressure on reserves and the interest-adjusted loss ratio, and that the purportedly expected loss ratio was not sustainable.

#### 1. Pre-Class Period False Statements and Omissions Concerning the Interest-Adjusted Loss Ratio

101. On December 16, 2014, Unum hosted its annual investor meeting with participation by McKenney and McGarry. During the meeting, in response to analyst's questions on potential triggers of future reserve charge, McGarry assured investors that the interest-adjusted loss ratio would remain in the expected 85% to 90% range long term:

> [Jimmy Bhullar – Analyst – JPMorgan:] And then lastly, for Jack, what are some of the things that we should be watching to get an idea on whether there is going to be a need for another reserve charge like one, two, three years down the road. Obviously interest rates is one, price hikes is another one but what is going on in terms of incidents, trends, claims severity, claims frequency?
>
> [McGarry:] You know, *I think longer-term we expect the long-term care loss ratio to hover in that 85% to 90% range*. I think if it were outside of that range for a prolonged period of time, it would begin to put pressure on the reserve assumptions.

102. On October 29, 2015, Unum hosted its 3Q2015 earnings call with participation by McKenney and McGarry. During the call, in response to questions concerning emerging

experiences relative to assumptions, McGarry unequivocally assured investors that "there is nothing in the way the results have emerged that would cause us concern" as loss ratio was "right in our target range":

> [Eric Berg – Analyst – RBC Capital Markets:] How has the various factors that underlie your active life reserves in long-term care in the closed block – how have they developed this year? Interest rates, claims, lapses, expenses, whatever else is critical to that reserve – how have they emerged relative to the assumptions that you reset in the fourth quarter of 2014? I guess, Jack.

> [McGarry:] . . . ***With respect to the rest of the reserve assumptions, I'd look to earnings. Our loss ratio has been pretty consistent this year. It's been right in our target range, and we are yet to fully complete our reserve adequacy study, but there is nothing in the way the results have emerged that would cause us concern.***

103.     On February 3, 2016, Unum hosted its 4Q2015 earnings call with participation by McKenney and McGarry. During the call, in response to analyst questions about claims trends, McGarry misguided investors by stating that "claim trends has stayed in that range at the 85% to 90% loss ratio." As analysts pressed on their inquiries with experiences in the group and individual policies book, McKenney falsely assured that any deviation from expectations would have showed up in the loss ratio. Instead, the ratio had been operating within its expected range:

> [Jimmy Bhullar – Analyst – JPMorgan:] And then on long-term care, obviously rates are challenging, how are the other things going like [claim trends], your success in achieving price hikes versus what you might assumed when you took the reserve charge in the fourth quarter of 2014?

> [McGarry:] Yes. ***So actually since we took the charge in 2014, things have been pretty much in line with our expectations. There's been some volatility quarter-to-quarter. But claim trends has stayed in that range at the 85% to 90% loss ratio. And we continue to make good progress on our rate increase assumptions. So both the rate of approvals and the actual implementations are pretty much in line with the underlying reserve assumptions.***

> *       *       *

> [Unidentified Audience Member:] Thank you. I was wondering if we could go back to the group and individual long-term care book, could we discuss loss severity and loss frequency. There was a P&C company that announced this week that it had to increase its long-term care reserves for higher frequencies. I know you

did the reserve strengthening last year predominantly due to interest rates, but wanted to see the performance in the loss costs due to those two factors.

[McKenney:] It's a fair question. Back in 2014, we did increase reserves primarily for interest rates, but also as part of that process, we actually re-struck all of the reserves, all of the assumptions relative to where we were from our own experience as well as industry experience looking forward. *And so, in 2014, everything was set up with current experience and what we saw over the course of 2015 was a tract also very closely to that. So you would have seen that, I mean a place you can see that on a quarterly basis is in our loss ratio in our long-term care business, which we bring out there. We talk about that operating within a range of 85% to 90%, which we saw over the course of 2015. So, it's actually the severity of loss and the frequency has actually been very consistent with those expectations from 2014 as we reset those.*

104.    On April 28, 2016, Unum hosted its 1Q2016 earnings call with participation by McKenney and McGarry. During the call, in response to analyst's concerns about the interested-adjusted loss ratio hovering near the high end of expectation, Defendants falsely claimed that they were not "seeing anything in underlying trends":

[John Nadel – Analyst – Sterne, Agee & Leach, Inc.:] I guess the only real area of focus I've got in the numbers is that the last few quarters now, in the closed block, the long-term care benefit ratio has been hovering in that 88% to 89% range. So, it's toward the upper end of your 85% to 90% expectation. Is there anything of worry there when you look, underlying that benefit ratio, in terms of some of the underlying trends there?

[McGarry:] Yes, John, I'll take that. *We're not really seeing anything in underlying trends. There's some volatility in the results we see, but if you look at over the average, it's pretty close to being right in the middle of that range, which is where we're comfortable.* And we have seen it bounce around quarter to quarter.

[McKenney:] I think, John, you highlighted the last three quarters. *But if you went to the beginning of last year, we actually saw very favorable results.*

### 2.    Class Period False Statements and Omissions Concerning the Interest-Adjusted Loss Ratio

105.    After the market closed on October 26, 2016, the Company issued a Form 8-K press release, entitled "Unum Group Reports Third Quarter 2016 Results," signed by Vice President, Managing Counsel, and Corporate Secretary J. Paul Jullienne ("Jullienne"). Unum blamed a one-off

- 48 -

event for the exceedingly high loss ratio – a group client's policies had switched to individual

policies status:

> *The interest adjusted loss ratio for the long-term care line of business was 93.8 percent in the third quarter of 2016 compared to 89.9 percent in the third quarter of 2015, due to a higher average size of new claims and less favorable mortality experience, as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016.*

106.     On October 27, 2016, the Company hosted its 3Q2016 earnings call with participation

by McKenney and McGarry.  During his prepared remarks, McGarry told investors that the elevated

claims rate for the quarter was due to a one-off event, namely the termination of the Company's

largest group case, which had a unique auto-portability feature.  McGarry stated: "In the absence of

this unique case termination, our long-term care loss ratio would have been in the 85% to 90% range,

consistent with our long-term expectations":

> [McGarry:] *For the long-term care line of business, the interest adjusted loss ratio was 93.8% for the third quarter compared to 89.9% in the year ago quarter.  The long-term care loss ratio was elevated due to the termination of our largest group case*, which also had a unique auto-portability feature.  I'll explain the impact of this termination in more detail in a moment.  *In the absence of this event, the long-term care loss ratio would have been in the upper end of our 85% to 90% range.*
>
> *Similar to the second quarter we continue to see some pressure on new claims incidents and severity from rate increase notifications to policyholders that have been delivered recently.  This impact was significantly diminished in the third quarter relative to the second quarter, but we would expect to continue to see some impact over the next several quarters.  Also, we experienced less favorable mortality experience in the long-term care line this quarter*.
>
> \*        \*        \*
>
> As lives port, we changed the persistency assumption underlying their reserves from a group assumption to a significantly lower individual assumption, which results in a much larger reserve.  The unusually large number of ports, coupled with the corresponding increase in reserves adversely impacted our loss ratio this quarter.  *In the absence of this unique case termination, our long-term care loss ratio would have been in the 85% to 90% range, consistent with our long-term expectations.*

107.     On the same day, Unum filed its 3Q2016 Form 10-Q and reiterated the effect of the

one-off event on the interested-adjusted loss ratio:

> **Long-term care experienced volatility during the second and third quarters of 2016, with resulting interest adjusted loss ratios for the third quarter and first nine months of 2016 slightly higher than our range of expectations.**

*     *     *

> **Long-term care benefits experience was unfavorable in the third quarter and first nine months of 2016 compared to the same periods of 2015 due to a higher average size of new claims and less favorable mortality experience, as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016.**

108.     On February 1, 2017, the Company filed a Form 8-K press release, entitled "Unum

Group Reports Fourth Quarter 2016 Results," signed by Vice President, Managing Counsel, and

Jullienne.  In the Form 8-K, Unum attributed favorable mortality and policy termination as the

drivers of the interest-adjusted loss ratio:

> **The interest adjusted loss ratio for the long-term care line of business was 89.1 percent in the fourth quarter of 2016 compared to 89.7 percent in the fourth quarter of 2015, due primarily to favorable mortality experience and the impact of persistency on active life reserves.**

109.     On February 2, 2017, the Company hosted a conference call to discuss its fourth

quarter and full year 2016 financial results, with participation by McKenney and McGarry.  During

his prepared remarks, McGarry again blamed the elevated loss ratio to the unusual, one-time porting

of group policies into individual policies:

> [McGarry:] **I will point out that since the fourth quarter of 2014 reserve adjustment, the interest adjusted loss ratio has been 89.4% within the long-term ratio of 85% to 90% that we expect.  Adjusting for the impact of the large group case termination which impacted the loss ratio in the third quarter of 2016, this two-year cumulative loss ratio would be 88.1%.**

110.     On February 22, 2017, Unum filed its 2016 Form 10-K, where the Company again

blamed the elevated interest adjusted loss ratio in 2016 to the one-time event of the conversion of a

group case to individual policies.  Furthermore, while discussing the adverse development of the

lapse rate driving the loss ratio in 2015, Defendants failed to disclose that such development was due to the individual policies' experience significantly deviated from assumption:

Operating Results

Shown below are financial results and key performance indicators for the Closed Block segment.

*(in millions of dollars, except ratios)*

| | Year Ended December 31 | | | | |
| | 2016 | % Change | 2015 | % Change | 2014 |
|---|---|---|---|---|---|
| Interest Adjusted Loss Ratios: | | | | | |
| Long-term Care | 91.1 % | | 87.6 % | | 196.6 % |
| Long-term Care Excluding the Reserve Increase | — % | | — % | | 85.9 % |
| | | | | | |
| Persistency: | | | | | |
| Long-term Care | 94.8 % | | 95.7 % | | 95.4 % |

Year Ended December 31, 2016 Compared with Year Ended December 31, 2015

\*　　　\*　　　\*

*Long-term care benefits experience was unfavorable relative to the prior year due to higher submitted claims as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016.*

\*　　　\*　　　\*

Year Ended December 31, 2015 Compared with Year Ended December 31, 2014

\*　　　\*　　　\*

*Long-term care benefits experience was favorable relative to the prior year due to the 2014 reserve increase, as previously discussed. Excluding this reserve increase, long-term care benefits experience was unfavorable compared to 2014 due to less favorable development in active life reserves as a result of higher persistency.*

111.	On April 26, 2017, the Company filed a Form 8-K press release, entitled "Unum Group Reports First Quarter 2017 Results," signed by Vice President, Managing Counsel, and Jullienne. The 1Q2017 Form 8-K attributed the interest adjusted loss ratio to "favorable mortality experience":

*The interest adjusted loss ratio for the long-term care line of business was 88.6 percent in the first quarter of 2017 compared to 88.9 percent in the first quarter of 2016, primarily driven by favorable mortality experience.*

112.     On April 27, 2017, the Company hosted a conference call to discuss its 1Q2017 financial results with participation by McKenney, McGarry, and Zabel.  During his prepared remarks, McGarry elaborated on the Company's long-term care business, claiming that the loss ratio remained in line with expected levels:

> [McKenney:] Finally, *we saw stable results in our Closed Block operations. I believe that we have proven our ability to consistently produce strong results during these uneven business conditions and that we remain very well positioned in our markets.*
>
> *              *              *
>
> [McGarry:] *For the long-term care line, the interest adjusted loss ratio was 88.6% for the first quarter compared to the year-ago ratio of 88.9%.  This slight improvement was primarily driven by favorable mortality experience.  Importantly, the long-term care benefit ratio remains within our expected range of 85% to 90%.*

113.     On July 27, 2017, the Company filed a Form 8-K press release, entitled "Unum Group Reports Second Quarter 2017 Results," signed by Vice President, Managing Counsel, and Jullienne.  The Form 8-K stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 89.4 percent in the second quarter of 2017 compared to 92.6 percent in the second quarter of 2016, primarily driven by lower claims incidence":

> *The interest adjusted loss ratio for the long-term care line of business was 89.4 percent in the second quarter of 2017 compared to 92.6 percent in the second quarter of 2016, primarily driven by lower claims incidence.*

114.     The next day, the Company hosted a conference call to discuss its 2Q2017 financial results, with participation by McKenney, McGarry, and Zabel.  During his prepared remarks, McGarry stated: "*For the long-term care line, the interest adjusted loss ratio was 89.4% for the second quarter compared to the year-ago ratio of 92.6%.  This improvement was driven primarily by lower claims incidence relative to last year's second quarter.*"

115.     On September 6, 2017, McKenney participated in the KBW Insurance Conference and falsely assured investors that actual experiences had been tracking with expectations as reflected in the loss ratio:

> [Ryan Krueger – Analyst – Keefe, Bruyette & Woods, Inc.:] On long-term care, can you give an update on how the claims have developed relative to the assumptions as well as the rate increases which you – relative to the assumptions when you took the charge in 2014?

> [McKenney:] Yes.  *So we reset all our assumptions back in 2014 relative to our expectations.  One of the things we put out there is watching the loss ratio, the 85% to 90%.  It's been tracking in that range.  Although we've had quarters below or quarters above, it's still kind of generally there.  So I'd say that's tracking reasonably well*.

116.     On October 25, 2017, the Company filed a Form 8-K press release, entitled "Unum Group Reports Third Quarter 2017 Results," signed by Vice President, Managing Counsel, and Jullienne.  In the Form 8-K, Unum attributed the unfavorable policyholder lapses as the driver of the loss ratio but failed to disclose that lapse experience for the individual business had been significantly deviating from assumptions since the 2014 comprehensive review:

> *The interest adjusted loss ratio for the long-term care line of business was 93.3 percent in the third quarter of 2017 compared to 93.8 percent in the third quarter of 2016, due to the impact of a large group case moving to an individual policy ported status in 2016, partially offset by unfavorable policyholder lapses in the current quarter.*

117.     On October 26, 2017, the Company hosted a conference call to discuss its 3Q2017 financial results, with participation by McKenney and McGarry.  During his prepared remarks, McGarry stated that the quarterly uptick in the long-term care interest adjusted loss ratio was an aberration due to unfavorable policy lapses, without disclosing that lapse experience for the individual business had been significantly deviating from assumptions since the 2014 comprehensive review:

> [McGarry:] Finally, for the Closed Block, operating income declined to $26.6 million in the third quarter from $28.6 million in the year-ago quarter.  *For long-*

*term care, the interest-adjusted benefit ratio was 93.3%, above our expected range of 85% to 90%, although slightly favorable to last year's 93.8%.*

*As you may recall, last year's benefit ratio was elevated due to the impact of a large group case that moved to an individual ported status. The elevation in the current benefit ratio is largely attributable to unusually unfavorable policyholder lapses. Although we'd rather than not see this volatility, we're encouraged that the underlying claims experience was consistent with historical norms.*

118. On the same day, Unum filed its 3Q2017 Form 10-Q and reiterated the effect of the one-off event on the interested adjusted loss ratio. In addition, Unum attributed the unfavorable policyholder lapses as the driver of the loss ratio but failed to disclose that lapse experience for the individual business had been significantly deviating from assumptions since the 2014 comprehensive review:

*Benefits experience in our long-term care line of business resulted in interest adjusted loss ratios that were favorable in the third quarter and first nine months of 2017 relative to the same prior year periods but were slightly higher than our range of expectations.*

\*   \*   \*

*Long-term care benefits experience was favorable in the third quarter and first nine months of 2017 compared to the same periods of 2016 due to the impact of a large group case moving to an individual policy ported status during 2016. Somewhat offsetting the favorable benefits experience during the third quarter of 2017 were unfavorable policyholder lapses.*

119. On December 13, 2017, Unum hosted its annual investor meeting with participation by McKenney, McGarry, and Zabel. During the meeting, McGarry assured investors that interest margin served to offset the effect of the heighted loss ratio:

[McGarry:] [W]e have experienced a higher interest-adjusted loss ratio in long-term care. It's at the very high-end over an extended – over a 5-year period or 4-year period since we closed it. It's – recently, it's been running in the low 90s. We would expect that to continue into 2018. *We feel good about where our reserves are, that interest margin has helped to offset the loss – the heightened loss ratio and so we feel good.* We will not be taking a charge in long-term care during the fourth quarter of 2017.

- 54 -

120.    On January 31, 2018, the Company filed a Form 8-K press release, entitled "Unum Group Reports Fourth Quarter 2017 Results," signed by Vice President, Managing Counsel, and Jullienne.  The Form 8-K stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 93.1 percent in the fourth quarter of 2017 compared to 89.1 percent in the fourth quarter of 2016, primarily due to unfavorable policy terminations related to mortality experience":

> *The interest adjusted loss ratio for the long-term care line of business was 93.1 percent in the fourth quarter of 2017 compared to 89.1 percent in the fourth quarter of 2016, primarily due to unfavorable policy terminations related to mortality experience.*

121.    On February 1, 2018, the Company hosted a conference call to discuss its fourth quarter and full-year 2017 financial results, with participation by McKenney, McGarry and Zabel. During his prepared remarks, McGarry stated that the elevated adjusted loss ratio in long-term care was within recently revised near-term expectations of the "low 90s," and that this higher loss ratio was being offset by other favorable factors.  Later in the call, McGarry clarified that, by the "low 90s," Unum meant that the interest adjusted loss ratio would not exceed 95%.  In addition, he falsely assured investors of the favorable emerging experience relating to rate increases and touted that Unum "will achieve the rate increase expectations assumed in our reserve assumptions":

> [McGarry:] *Two important factors related to the long-term care line continue to trend favorably this quarter*.  First, our new money yield this quarter was, again, above our assumption of 5% . . . .  Second, *while it's a quiet quarter for rate increase approvals on inforce business, we still have a few large rate requests yet to be decided.  Even without these, we're confident we will achieve the rate increase expectations assumed in our reserve assumptions.  It bears repeating that we assume no future rate increases in our current reserve assumptions*, though we intend to actively pursue future rate increases where justified.

> *        *        *

> [Suneet Laxman L. Kamath – Analyst – Citigroup Inc.:] Got it.  And then just in terms of the price increases.  I mean, I'm assuming that what you've asked for so far was assuming in the 85% to 90%.  And so if we are elevated 90% to 95%, how much of an incremental price increase would you need if we're at those loss ratios?

- 55 -

[McGarry:] . . . *I think we're comfortable that with the dry powder we have on rate increases, given emerging experience and the buffer we have between GAAP and stat that we wouldn't see the remedy to this causing any impact on our capital plans*.

122.     On February 21, 2018, Unum filed its 2017 Form 10-K, where the Company attributed the elevated interest adjusted loss ratio to claims termination and the one-time event of the conversion of a group case to individual policies:

Operating Results

Shown below are financial results and key performance indicators for the Closed Block segment.

| | Year Ended December 31 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | % Change | 2016 | % Change | 2015 |
| Interest Adjusted Loss Ratios: | | | | | |
| Long-term Care | 91.1 % | | 91.1 % | | 87.6 % |
| Persistency: | | | | | |
| Long-term Care | 95.9 % | | 94.8 % | | 95.7 % |

Year Ended December 31, 2017 Compared with Year Ended December 31, 2016

*          *          *

*Long-term care benefits experience was consistent with the prior year as unfavorable policyholder terminations, due primarily to mortality experience, offset by the impact of a large group policy case moving to an individual policy ported status during 2016. Also impacting benefits experience relative to 2016 was unfavorable mortality experience in our group pension product*.

*          *          *

Year Ended December 31, 2016 Compared with Year Ended December 31, 2015

*          *          *

*Long-term care benefits experience was unfavorable relative to 2015 due to higher submitted claims as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016*.

123.     The statements referenced in ¶¶101-122 above were materially false and/or misleading when made because Defendants used their disclosures about Unum's interest-adjusted loss ratio to (1) conceal Unum's worsening rate increase, policy termination, and incurred claims

- 56 -

Case 1:18-cv-00128-TAV-CHS   Document 37   Filed 01/15/19   Page 60 of 123   PageID #: 346

trends and experiences; and (2) assure assuring investors a manageable interest-adjusted loss ratio validated the adequacy of Unum's reserves.

124.    Before and during the Class Period, in order to disguise the deviation of actual experiences from assumptions, Unum deflected investors' inquiries into the actual trends and experiences by referring investors to the interest adjusted loss ratio.  For example, in December 2014, an analyst asked "what is going on in terms of incidents, trends, claims severity, claims frequency?"  Instead of disclosing actual experiences relating to claims incidents, severity and frequency, McGarry stated: "I think longer-term we expect the long-term care loss ratio to hover in that 85% to 90% range.  I think if it were outside of that range for a prolonged period of time, it would begin to put pressure on the reserve assumptions."

125.    Similarly, on October 29, 2015, an analyst asked "[i]nterest rates, claims, lapses, expenses, whatever else is critical to that reserve – how have they emerged relative to the assumptions that you reset in the fourth quarter of 2014?"  McGarry again responded:

> Our loss ratio has been pretty consistent this year.  It's been right in our target range, and we are yet to fully complete our reserve adequacy study, but there is nothing in the way the results have emerged that would cause us concern."

126.    Again, on September 6, 2017, an analyst asked about how "claims have developed relative to assumptions as well as the rate increases . . . relative to the assumptions when you took the charge in 2014?"  McKenney responded that experiences were "tracking reasonably well" because the loss ratio was within the assumed 85% to 90% range.

127.    In truth, experiences had not been tracking assumptions well and persistently deviated from expectations.  Before and during the Class Period, rate increase approvals for 2014 requests had been lagging behind assumptions – infested by approval delays, phase-in requirements, implementation delays, and smaller approvals, all in deviation from historical experiences embedded in the reserves assumptions.  *See* ¶¶79-82.  Similarly, individual policies' actual experiences had also

deviated from assumptions, with significantly more policyholders retaining their policies instead of lapsing and driving incurred claims to 23% higher than expectations by 2017. *See* ¶¶91-93. Expected claim amounts for claims incurred in 2014 and 2015 were restated higher each year – with cumulative revision of 7% for the 2014 incurred claims and 6% for the 2015 incurred claims as of the end of 2017 – indicating that experience was worse than assumptions. *See* ¶¶147-151. In total, actual incurred claims exceeded Unum's expectations by over $257 million by the end of 2017. *See* ¶¶94-95. With premiums from rate increases coming in below expectations and incurred claims coming in above expectations, reserves were put under severe pressure. *See* ¶¶147-155.

128. Defendants were able to conceal these adverse trends by constantly referring investors to Unum's loss ratio. And even when Unum's loss ratio exceeded the 85% to 90% range that they had told investors to expect, Defendants blamed such deviations on one-time occurrences, rather than disclose the systematic trends impacting the LTC block. *See* §§VII.D.-F..

129. Ultimately, the collective pressure of worsening premium, lapse, and claims experiences – built up since at least the end of 2014 – drove the interest adjusted loss ratio to an upward trajectory and over 96% by the end of the Class Period:



130.    As Defendants admitted during the May 2, 2018 earnings call, the elevated loss ratio

was caused by rate increase, lapse, and higher incurred claims experiences:

> The long-term care business line had a more challenging quarter, as the interest
> adjusted benefit ratio increased to 96.6% in the first quarter this year compared to the
> favorable year-ago first quarter of 88.6%.  Benefits experienced this quarter was
> driven by new claim incidence that ran much higher than expected, which was
> partially offset by favorable claim resolutions due to mortality.  In addition, the
> higher loss ratio this quarter was negatively impacted by a lower level of policy
> terminations.
>
> *        *        *
>
> [W]e have not received approvals as quickly as originally estimated, and those
> approvals received have been phased-in over a longer time period than originally
> anticipated. This has had the effect of increasing our reported loss ratio in the recent
> past by 3% to 4%.

**D.    Materially False Statements and Omissions Concerning Reserves
Monitoring and Adequacy**

131.    Before and during the Class Period, Defendants made materially false and misleading

statements and omissions concerning Unum's monitoring of emerging experiences to ensure its

reserves were adequately funded.   In truth, Defendants persistently ignored the Company's

experience data and its drastic deviation from assumptions, which, in turn, caused both policy and

claims reserves to become increasingly inadequate during the Class Period.

**1.    Pre-Class Period False Statements and Omissions Concerning
Reserves Monitoring and Adequacy**

132.    On December 16, 2014, Unum hosted its annual investor meeting with participation

by McKenney and McGarry.  During the meeting, McGarry assured investors that Unum would

continuously ensure that the assumptions stayed current with claims experience:

> [McGarry:] We have conducted a comprehensive review.  As you know we
> invested a lot of resources behind the block in 2013.  Those resources build some
> state-of-the-art financial analysis tools and we undertook a comprehensive review of
> virtually every assumption underlying the long-term care block.  The result of that
> review, there were puts and takes.  Virtually every assumption underlying the block
> got updated . . . .

- 59 -

*      *      *

So one of the things we are looking at as we take these charges in long-term care is to make sure that we have some durability to the assumptions that we put underlying the block.

*      *      *

We did a lot of work in defining what the current assumption base is. ***The ongoing work is really around monitoring that for emerging experience and making sure that it stays current***.

133.    Unum hosted its 4Q2014 earnings call on February 4, 2015 with participation by McKenney and McGarry.  During the call, McKinney assured investors that "[r]isk results were generally in line with our long-term expectations":

[McKenney:] Rounding out the enterprise with the Closed Block, with the completion of our reserve review in long-term care, we booked to reserve strengthening in line with the expectations we provided at our investor meeting in December.  The addition to GAAP reserves was $698 million or $454 million after-tax.

*      *      *

Excluding the impact of the reserve charge, operating earnings for the Closed Block were $30 million in the quarter compared to $26.8 million in the year-ago quarter. ***Risk results were generally in line with our long-term expectations***.

134.    On October 29, 2015, Unum hosted its 3Q2015 earnings call with participation by McKenney and McGarry.  During the call, in response to an analyst's request for an update on any emerging trends in the assumptions underlying the reserves, McGarry stressed that "there is nothing" in the annual reserve adequacy review that caused any concern:

[Eric Berg – Analyst – RBC Capital Markets:] How has the various factors that underlie your active life reserves in long-term care in the closed block – how have they developed this year?  Interest rates, claims, lapses, expenses, whatever else is critical to that reserve – how have they emerged relative to the assumptions that you reset in the fourth quarter of 2014?

*      *      *

[McGarry:] ***With respect to the rest of the reserve assumptions, I'd look to earnings.  Our loss ratio has been pretty consistent this year.  It's been right in our***

*target range, and we are yet to fully complete our reserve adequacy study, but there is nothing in the way the results have emerged that would cause us concern.*

135.    On December 17, 2015, Unum hosted its annual investor meeting with participation by McKenney and McGarry.   During the meeting, McGarry assured investors that Unum was "comfortable" with its LTC reserves after the 2015 annual review:

[McGarry:] *Looking at the performance since the reserve charges we took in 2014, it's been very steady.  We've completed our reserve adequacy studies for 2015.  We're very comfortable with where our reserve position is currently*. . . .  *[W]e're very comfortable with where we are since that reserve adjustment and feel good that we have time in our interest rate assumption for some time to come*.

136.    On February 3, 2016, Unum hosted its 4Q2015 earnings call with participation by McKenney and McGarry.   During the call, McGarry reiterated that he was "comfortable" and felt good about reserves adequacy after the 2015 annual review as "risk  results remained within our long-term expectations":

[McGarry:] *Regarding the reserve position for long-term care, we feel good about where we finished 2015 in terms of reserve adequacy.*  For the year, our new money yields exceeded our interest rate assumptions and *risk results remained within our long-term expectations.   In addition, rate increase approvals and implementation are tracking in line with our reserve assumptions.*

\*         \*         \*

[Tom Gallagher – Analyst – Credit Suisse:] I think in the past, you guys have been able to say, or give some indication about, when – what at least the next year's outlook would be.  Would you say based on what you know today, there would be a very low likelihood of a reserve addition in 2016, or is it too early to tell?

[McGarry:] I don't think we've actually provided outlooks on our reserve positions at year end*.   I would say we feel comfortable with where we are today.  We just went through a reserve review that culminated in the quarter we're talking about.  So where we're as close to an ending reserve review as you can get, we feel good about that reserve review and where it ended.*

137.    On February 10, 2016, McKenney participated in the Bank of America Merrill Lynch Insurance Conference.   At the conference, he reiterated that Unum had updated all of the LTC

reserves assumptions during the comprehensive review in 2014 and everything in 2015 was on track

with expectations:

> [Unidentified Audience Member:] I was wondering if we could go back to the group and individual long-term care book, could we discuss loss severity and loss frequency. There was a P&C company that announced this week that it had to increase its long-term care reserves for higher frequencies. I know you did the reserve strengthening last year predominantly due to interest rates, but wanted to see the performance in the loss costs due to those two factors.

> [McKenney:] It's a fair question. Back in 2014, we did increase reserves primarily for interest rates, but also as part of that process, we actually re-struck all of the reserves, all of the assumptions relative to where we were from our own experience as well as industry experience looking forward. ***And so, in 2014, everything was set up with current experience and what we saw over the course of 2015 was a tract also very closely to that. So you would have seen that, I mean a place you can see that on a quarterly basis is in our loss ratio in our long-term care business, which we bring out there. We talk about that operating within a range of 85% to 90%, which we saw over the course of 2015. So, it's actually the severity of loss and the frequency has actually been very consistent with those expectations from 2014 as we reset those.***

138.     On September 7, 2016, McKenney participated in the KBW Insurance Conference.

During the conference, in response to analyst's questions concerning claims trend and rate increase

progress relative to assumptions, McKenney misrepresented that all assumptions were tracking well

to expectations:

> ***And then when you look across our other assumptions, I think in aggregate we feel reasonably good about all of them as has transpired. Obviously, we will go through and reassess those as we do every year.*** And then from an interest rate perspective, we isolate that quite often as well. The first two years since we've done that, year and three quarters, we've invested very well relative to our expectations and we will continue to update as we go forward on that front. ***So things are tracking reasonably well to our expectations at that point in time.***

### 2.     Class Period False Statements and Omissions Concerning Reserves Monitoring and Adequacy

139.     On October 27, 2016, the Company hosted its 3Q2016 earnings call with participation

by McKenney and McGarry. During the call, McGarry misled investors about Unum's reserve

adequacy by stating that (1) "no special reserving" will be necessary, (2) the long term care segment

was in "better shape today than . . . three years ago," and (3) claims experience tracked closely to assumptions established during the 2014 comprehensive review:

> [McGarry:] *We will conclude this year's reserve review for long-term care over the next several weeks and currently believe that no special reserving will be necessary for year-end 2016.*

> \*        \*        \*

> [Bob Glasspiegel – Analyst – Janney Montgomery Scott:] I'm just curious if you had any reactions to Genworth's series of announcements, specifically the charge for long-term care related to more longer-duration claims, which I think you've commented you've been seeing to some extent. But are they ahead or behind the curve in your view, and do you have a rooting interest on the success of their actions and any general commentary on their strategic move would be appreciated?

> \*        \*        \*

> [McGarry:] And so I don't really want to talk about what Genworth is seeing. I will tell you what we are seeing, and I think probably the most fundamentally important point is we are not scrambling to keep pace with long-term care. We are working through the long-term care issue. And we are making significant progress as a company toward doing that. *We feel like we are in so much better shape today than we were even three years ago*, and a lot of that is because of that active management of the block.

> So let me talk to you about what some of those things have been. *In 2014 we reset reserve assumptions. We placed those reserve assumptions on a best estimate basis using our current own experience, and our experience since then has been consistent with those expectations*.

> *We also established – when we establish[ed] those reserves, we built in currently-filed rate increases using historical approval rates. Less than a third of those rate increase assumptions remain outstanding. We are making significant progress against them and feel very good about where the assumptions lie with only a small portion remaining*.

> *That not only helps to support our reserve assumptions, but it also gives us room in the future to react to future adverse claims experience should it emerge. The third point I'd make is that our block's unique in the long-term care business, as approximately half of the block is group long-term care with employer funding and extremely conservative plan designs*. And because of that group coverage and employer funding, most employees terminate their employer-funded coverage when they leave the employer.

140.    During the Class Period, each of the 3Q2016 Form 10-Q (filed on October 27, 2016),

1Q2017 Form 10-Q (filed on April 27, 2017), 2Q2017 Form 10-Q (filed on July 28, 2017), and

3Q2017 Form 10-Q (filed on October 26, 2017) was signed and certified by McKenney and McGarry. Waxenburg also signed the 1Q2017 Form 10-Q, 2Q2017 Form 10-Q, and 3Q2017 Form 10-Q. In each of the Form 10-Q filings, Unum represented to investors that it continuously monitored risk in the LTC segment and adjusted its business plans accordingly:

Segment Outlook

*　　　*　　　*

*We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly.*

141.　On December 15, 2016, Unum hosted its annual Investor Day with participation by McKenney, McGarry, and Zabel. During the Company's presentation to investors, McKenney emphasized the stability of the Closed Block business, while Zabel assured investors that he "fel[t] really good" about the state of the LTC reserve assumptions after the 2016 reserves adequacy study:

[McKenney:] *The Closed Block has been stable over the course of the year.* Steve Zabel will talk to about the attributes of our Closed Block and where that's going. But we think over the course of the year saw little blips here and there, but *I will tell you the underlying of the business seemed very stable*.

*　　　*　　　*

[Zabel:] As Jack mentioned, *we've gone through our reserve adequacy study. This year we feel really good about where we are at both from the liability assumptions whether it's incidence, mortality, duration of claim we feel pretty good all in about how that's going*.

*　　　*　　　*

[McGarry:] *we are comfortable with where the reserves are now. We are comfortable they are adequate*.

142.　On February 22, 2017, Unum filed its 2016 Form 10-K and touted its reserves policies as "in conformity with GAAP," with the Company "continuously monitor key indicators to assess" its risks:

*Our sound and consistent business practices, strong internal compliance program, and comprehensive risk management strategy enable us to operate efficiently as well as to identify and address potential areas of risk in our business*.

- 64 -

\*       \*       \*

*we intend to continue protecting our solid margins and returns through our pricing and risk actions*.

\*       \*       \*

*We monitor our own experience and industry studies concerning morbidity, mortality, and policyholder terminations to understand emerging trends*.

\*       \*       \*

Closed Block Segment

\*       \*       \*

        *The reserves reported in our financial statements contained herein are calculated in conformity with GAAP* . . . .

*We periodically review our experience and update our policy reserves for new issues and reserves for all claims incurred, as we believe appropriate*.

\*       \*       \*

Policy Reserves

\*       \*       \*

        •        *Persistency assumptions are based on our actual historical experience adjusted for future expectations*.

        •        *Claim incidence and claim resolution rate assumptions related to mortality and morbidity are based on actual experience or industry standards adjusted as appropriate to reflect our actual experience and future expectations*.

        •        Discount rate assumptions are based on our current and expected net investment returns.

        *In establishing policy reserves, we use assumptions that reflect our best estimate while considering the potential for adverse variances in actual future experience, which results in a total policy reserve balance that has an embedded reserve for adverse deviation*. . . .

\*       \*       \*

Key assumptions are persistency, mortality and morbidity, claim incidence, claim resolution rates, commission rates, and maintenance expense rates.  For long-term care, premium rate increases are also a key assumption.

\*       \*       \*

- 65 -

Claim Reserves

\*      \*      \*

*Claim reserves, unlike policy reserves, are subject to revision as current claim experience and projections of future factors affecting claim experience change. Each quarter we review our emerging experience to ensure that our claim reserves are appropriate. If we believe, based on our actual experience and our view of future events, that our long-term assumptions need to be modified, we adjust our reserves accordingly with a charge or credit to our current period income.*

\*      \*      \*

The following table displays policy reserves, incurred claim reserves, and IBNR claim reserves by major product line, with the summation of the policy reserves and claim reserves shown both gross and net of the associated reinsurance recoverable. . . .

| (in millions of dollars) | December 31, 2016 | | | | | | | |
| | Gross | | | | | | Total Reinsurance Ceded | Total Net |
| | Policy Reserves | % | Claim Reserves | | % | Total | | |
| | | | Incurred | IBNR | | | | |
| Individual Disability | 513.6 | 2.8 | 9,696.4 | 251.6 | 42.8 | 10,461.6 | 1,601.2 | 8,860.4 |
| Long-term Care | 7,898.4 | 43.3 | 1,360.4 | 156.6 | 6.4 | 9,395.4 | 41.8 | 9,353.6 |
| Other | 5,848.3 | 32.0 | 189.9 | 132.1 | 1.3 | 6,170.2 | 5,030.6 | 1,139.6 |
| Closed Block Segment | 14,260.3 | 78.1 | 11,246.6 | 520.3 | 50.5 | 26,027.2 | 6,673.6 | 19,353.6 |
| Subtotal | $ 18,252.2 | 100.0 % | $ 21,492.3 | $ 1,756.1 | 100.0 % | 41,500.6 | 7,070.6 | 34,430.0 |
| Adjustment Related to Unrealized Investment Gains and Losses | | | | | | 4,253.2 | 321.3 | 3,931.9 |
| Consolidated | | | | | | $ 45,753.8 | $ 7,391.9 | $ 38,361.9 |

| (in millions of dollars) | December 31, 2015 | | | | | | | |
| | Gross | | | | | | Total Reinsurance Ceded | Total Net |
| | Policy Reserves | % | Claim Reserves | | % | Total | | |
| | | | Incurred | IBNR | | | | |
| Individual Disability | 620.0 | 3.5 | 9,922.8 | 259.2 | 42.8 | 10,802.0 | 1,568.5 | 9,233.5 |
| Long-term Care | 7,383.3 | 41.9 | 1,225.4 | 123.4 | 5.7 | 8,732.1 | 42.5 | 8,689.6 |
| Other | 5,810.8 | 32.9 | 204.2 | 140.5 | 1.4 | 6,155.5 | 4,991.0 | 1,164.5 |
| Closed Block Segment | 13,814.1 | 78.3 | 11,352.4 | 523.1 | 49.9 | 25,689.6 | 6,602.0 | 19,087.6 |
| Subtotal | $ 17,650.7 | 100.0 % | $ 22,042.5 | $ 1,753.6 | 100.0 % | 41,446.8 | 6,920.9 | 34,525.9 |
| Adjustment Related to Unrealized Investment Gains and Losses | | | | | | 3,578.4 | 263.2 | 3,315.2 |
| Consolidated | | | | | | $ 45,025.2 | $ 7,184.1 | $ 37,841.1 |

Key Assumptions

The calculation of policy and claim reserves involves numerous assumptions, but the primary assumptions used to calculate reserves are (1) the discount rate,

(2) the claim resolution rate, and (3) the claim incidence rate for policy reserves and IBNR claim reserves.

* * *

The incidence rate, used for policy reserves and IBNR claim reserves, is the rate at which new claims are submitted to us. The incidence rate is affected by many factors, including the age of the insured, the insured's occupation or industry, the benefit plan design, and certain external factors such as consumer confidence and levels of unemployment. *We establish our incidence assumption using a historical review of actual incidence results along with an outlook of future incidence expectations*.

* * *

Trends in Key Assumptions

*. . . Claim incidence rates for our Closed Block long-term care line of business continue to be generally consistent with the revised assumptions we established during our 2014 reserve review and assumption update.*

* * *

Segment Outlook

Our strategy for our Closed Block remains substantially unchanged. During 2017, we intend to continue our focus on long-term care premium rate increases and the offer of policyholder options, operational effectiveness, financial analysis, and capital management. . . . *We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly.*

143. On April 27, 2017, the Company hosted a conference call to discuss its 1Q2017 financial results with participation by McKenney, McGarry, and Zabel. During the call McGarry falsely claimed that "claims experience has remained generally in line with our assumptions" and nothing was pressuring Unum to take a reserve charge in 2017:

> [McGarry:] Overall, we continue to be pleased with the progress we're seeing in managing the long-term care block. *Our claims experience has remained generally in line with our assumptions since the end of 2014, when we updated our reserve assumptions to reflect our current view of the business. We are also making good progress on rate increase approvals on our in-force business*.

* * *

- 67 -

[Jamminder Singh Bhullar, Analyst, JP Morgan Chase & Co:]  First, just a question on long-term care and if there's been a change in your reviews on reserve adequacy. . . .

[McGarry:]  *I don't think there's anything pressuring us at the moment to take a charge in 2017. But again, we're going to look at it holistically around how we manage the block and what we think is in the best interest of shareholders.*

144.    On February 1, 2018, the Company hosted a conference call to discuss its fourth quarter and full-year 2017 financial results, with participation by McKenney, McGarry and Zabel. In response to an analyst's question about the comparison of Unum to GE, McGarry reassured analysts and investors that Unum's LTC business was on substantially more stable footing than that of GE – which had recently taken a multibillion dollar reserve charge related to its LTC business. McGarry highlighted the strength of Unum's reserves and how "within long-term care, timing matters" with reserve increases.  He also reminded analysts of the 2014 comprehensive review, where Unum reset its assumptions "to be consistent with our emerging experience":

[Ryan Krueger – Analyst – Keefe, Bruyette & Woods, Inc.:]  Given the significant magnitude of the GE Long Term Care reserve charge, could you discuss some of the key differences you see with your block versus theirs that give you more comfort with the reverse adequacy?

*            *            *

[McGarry:]  Between reserve increases and reserve charges, *we've strengthened reserve margins over time by $4 billion in the block, and I will tell you within long-term care, timing matters.  The earlier you move, the better off you're going to be.  And so we have been an early adopter in that in the block*. . . . [W]e did our comprehensive review of the long-term care block in 2014.  We provided a lot of resources to build sophisticated models.  *We reset our assumptions to be consistent with our emerging experience.  And on an ongoing basis, monthly, we track our actual to assumed assumptions, and we provide you quarterly updates with that on an ongoing basis*. . . . *[W]e just concluded our 2017 reserve accuracy studies.  We had margin in our reserves, as a result of that analysis*.

145.    On February 21, 2018, Unum filed its 2017 Form 10-K and touted its reserves policies as "in conformity with GAAP," with the Company "continuously monitor[ing] key indicators to assess" its risks:

- 68 -

*Our sound and consistent business practices, strong internal compliance program, and comprehensive risk management strategy enable us to operate efficiently as well as to identify and address potential areas of risk in our business.*

\* \* \*

*we intend to continue protecting our solid margins and returns through our pricing and risk actions.*

\* \* \*

*We monitor our own experience and industry studies concerning morbidity, mortality, and policyholder terminations to understand emerging trends.*

\* \* \*

Closed Block Segment

\* \* \*

*The reserves reported in our financial statements contained herein are calculated in conformity with GAAP* . . . .

. . . *We periodically review our experience and update our policy reserves for new issues and reserves for all claims incurred, as we believe appropriate.*

\* \* \*

Policy Reserves

\* \* \*

•    *Persistency assumptions are based on our actual historical experience adjusted for future expectations.*

•    *Claim incidence and claim resolution rate assumptions related to mortality and morbidity are based on actual experience or industry standards adjusted as appropriate to reflect our actual experience and future expectations.*

•    Discount rate assumptions are based on our current and expected net investment returns.

*In establishing policy reserves, we use assumptions that reflect our best estimate while considering the potential for adverse variances in actual future experience, which results in a total policy reserve balance that has an embedded reserve for adverse deviation*. . . .

\* \* \*

- 69 -

Key assumptions are persistency, mortality and morbidity, claim incidence, claim resolution rates, commission rates, and maintenance expense rates. For long-term care, premium rate increases are also a key assumption.

*    *    *

Claim Reserves

*    *    *

*Claim reserves, unlike policy reserves, are subject to revision as current claim experience and projections of future factors affecting claim experience change. Each quarter we review our emerging experience to ensure that our claim reserves are appropriate. If we believe, based on our actual experience and our view of future events, that our long-term assumptions need to be modified, we adjust our reserves accordingly with a charge or credit to our current period income.*

*    *    *

The following table displays policy reserves, incurred claim reserves, and IBNR claim reserves by major product line, with the summation of the policy reserves and claim reserves shown both gross and net of the associated reinsurance recoverable. . . .

| *(in millions of dollars)* | | | December 31, 2017 | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Gross | | | | Total | |
| | | | Claim Reserves | | | | Reinsurance | |
| | Policy Reserves | % | Incurred | IBNR | % | Total | Ceded | Total Net |
| Individual Disability | 418.5 | 2.2 | 9,407.4 | 219.1 | 41.5 | 10,045.0 | 1,619.8 | 8,425.2 |
| Long-term Care | 8414.3 | 44.5 | 1,494.8 | 150.9 | 7.1 | 10,060.0 | 40.3 | 10,019.7 |
| Other | 5894.8 | 31.3 | 187.3 | 120.4 | 1.2 | 6,202.5 | 5,090.6 | 1,111.9 |
| **Closed Block Segment** | 14727.6 | 78.0 | 11,089.5 | 490.4 | 49.8 | 26,307.5 | 6,750.7 | 19,556.8 |
| **Subtotal** | $ 18,890.1 | 100.0 % | $ 21,444.0 | $ 1,778.0 | 100.0 % | 42,112.1 | 7,160.3 | 34,951.8 |
| **Adjustment Related to Unrealized Investment Gains and Losses** | | | | | | 5,094.7 | 375.8 | 4,718.9 |
| **Consolidated** | | | | | | $ 47,206.8 | $ 7,536.1 | $ 39,670.7 |

| (in millions of dollars) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | December 31, 2016 | | | | | | | |
| | **Gross** | | | | | | **Total Reinsurance Ceded** | **Total Net** |
| | Policy Reserves | % | **Claim Reserves** | | % | Total | | |
| | | | Incurred | IBNR | | | | |
| Individual Disability | 513.6 | 2.8 | 9,696.4 | 251.6 | 42.8 | 10,461.6 | 1,601.2 | 8,860.4 |
| Long-term Care | 7,898.4 | 43.3 | 1,360.4 | 136.6 | 6.4 | 9,395.4 | 41.8 | 9,353.6 |
| Other | 5,848.3 | 32.0 | 189.8 | 132.1 | 1.3 | 6,170.2 | 5,030.6 | 1,139.6 |
| **Closed Block Segment** | 14,260.3 | 78.1 | 11,246.6 | 520.3 | 50.5 | 26,027.2 | 6,673.6 | 19,353.6 |
| **Subtotal** | $ 18,252.2 | 100.0 % | $ 21,492.3 | $ 1,756.1 | 100.0 % | 41,500.6 | 7,070.6 | 34,430.0 |
| **Adjustment Related to Unrealized Investment Gains and Losses** | | | | | | 4,253.2 | 321.3 | 3,931.9 |
| **Consolidated** | | | | | | $ 45,753.8 | $ 7,391.9 | $ 38,361.9 |

Key Assumptions

The calculation of policy and claim reserves involves numerous assumptions, but the primary assumptions used to calculate reserves are (1) the discount rate, (2) the claim resolution rate, and (3) the claim incidence rate for policy reserves and IBNR claim reserves.

\* \* \*

The incidence rate, used for policy reserves and IBNR claim reserves, is the rate at which new claims are submitted to us. The incidence rate is affected by many factors, including the age of the insured, the insured's occupation or industry, the benefit plan design, and certain external factors such as consumer confidence and levels of unemployment. *We establish our incidence assumption using a historical review of actual incidence results along with an outlook of future incidence expectations*.

\* \* \*

Trends in Key Assumptions

*. . . Claim incidence rates for our Closed Block long-term care line of business continue to be generally consistent with the revised assumptions we established during our 2014 reserve review and assumption update*.

\* \* \*

Segment Outlook

During 2018, we will continue to execute on our well-defined strategy of implementing long-term care premium rate increases, efficient capital management, improved financial analysis, and operational effectiveness. . . . *We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly*.

146. The statements referenced in ¶¶132-145 above were materially false and/or misleading when made because Defendants ignored indications of actual experience deviating from assumptions which resulted in Unum's reserves being consistently underfunded. While Defendants assured investors that Unum constantly monitored risk indicators, conducted annual reserve adequacy studies, and reviewed claims experience monthly and quarterly to ensure that assumptions were consistent with emerging experiences, Defendants continually ignored the deficiencies in rate increases and heightened risks in the individual policies business line caused by actual experiences deviating from assumptions. *See* ¶¶79-82; 90-99. As a result, both policy and claims reserves became more and more inadequate over time as worsening experiences increasingly burdened reserves.

### *Claims Reserves*

147. For disabled life reserves or claims reserves – reserves set up for policies that are already on claim – Unum represented to investors in each of its Form 10-K filings that such reserves "are subject to revision as current claim experience and projections of future factors affecting claim experience change. Each quarter we review our emerging experience to ensure that our claims reserves are appropriate." However, analyses of the evolution of claims incurred by Unum's individual policyholders revealed that claim reserve assumptions persistently failed to reflect actual experience and Defendants failed to update assumptions to bolster reserves.

148. As shown in the table below, Unum's expected claim amounts for claims incurred in any given year were consistently and immediately revised upwards in the following years – indicating emerging experience was worse than assumptions:

| Individual LTC Business | | |
|---|---|---|
| ($000) | Expected Claim Amounts | Cumulative Revision (%) |
| Claims Incurred in 2014 | $262,021 | |
| Restated in 2016 | $274,050 | 5% |
| Restated in 2017 | $280,581 | 7% |

149.    For example, for claims that were incurred by individual policyholders in 2014, Unum's expected claim amount established at the end of 2014 was $262 million.  By the end of 2016, after two years of claims experience on the 2014 incurred claims, the expected claim amount for those very same claims was revised upward by 5% to $274 million.  By the end of 2017, after three years of claims experience, the expected claim amount was again revised upward to $280.5 million – 7% higher than the original anticipated claims size.

150.    A similar pattern emerged for claims incurred in 2015, but this time, the expected claim amount was revised upward by 6% after only two years of claims experience:

| Individual LTC Business | | |
|---|---|---|
| $000 | Expected Claim Amounts | Cumulative Revision (%) |
| Claims Incurred in 2015 | $297,142 | |
| Restated in 2016 | $308,082 | 4% |
| Restated in 2017 | $314,229 | 6% |

151.    The Company's need to annually revise upward expected incurred claims for the individual block indicated that actual incurred claims experience was coming in worse than assumptions projected.  Nevertheless, even though Defendants repeatedly represented that – "[e]ach quarter we review our emerging experience to ensure that our claims reserves are appropriate" and if "based on our actual experience and our view of future events, that our long-term assumptions need to be modified, we adjust our reserves accordingly with a charge or credit to our current period income" – Defendants continuously failed to adjust assumptions to conform to actual experience.  As a result of Defendants' continual failure to adjust assumptions to worsening claims experience, Unum took a significant charge for reserves at the end of 3Q2018 with "$200 million for statutory

- 73 -

impact . . . . The majority of that actually relates towards disabled life reserve and just a flow-through of best estimate assumptions into the claim reserve."

### Policy Reserves

152.     In contrast to claims reserves or disabled life reserves established for policies that are already on claim, policy reserves covered future claims that had not yet been made but were expected to be made. To measure the sustainability of reserves for the individual block, the expected future claims amount was measured against the actual premium experience (premiums generated by the individual policies net of past incurred claims and expenses) to determine whether premiums were providing a natural buildup of reserves to meet future claims.

153.     The comparison revealed that Unum's individual block was suffering from a double whammy of declining actual premium experience and growing future claims:

| Individual LTC Business | | | |
|---|---|---|---|
| Year | Actual Premium Experience | Policy Reserves (expected future claims) | Experience-to-Expected Ratio |
| 2014 | $2,943,916,631 | $2,943,916,631 | 100.0% |
| 2015 | $2,937,732,102 | $3,168,661,042 | 92.7% |
| 2016 | $2,865,731,607 | $3,273,498,324 | 87.5% |
| 2017 | $2,776,814,752 | $3,427,282,443 | 81.0% |

154.     Between 2014 to 2017, Unum's LTC business suffered from (1) premiums coming in slower than expectations due to rate increase requests suffering from approval delays, phase in requirements, approved increases being less than expectations, and implementation delays (¶¶79-82); and (2) incurred claims getting generated faster than expectation (¶¶90-99). As a result, as shown in the table above, actual premium experience for the individual policies declined instead of building up to help meet increasing future claims. Accordingly, Defendants' October 27, 2016 statement concerning rate increase approvals "making significant progress against" assumptions, and that such progress "not only help[ed] to support [Unum's] reserve assumptions, but it also [gave the Company] room in the future to react to future adverse claims experience should it emerge" did not

comport with reality.  In actuality, rate increase approvals severely lagged against assumptions, causing a drag in the policy reserves instead of contributing to reserves to meet increasing future claims.

155.    As aptly summed up by an analyst on May 2, 2018, "the stock is down 15%. . . .  I think investors are doubting your reserve adequacy… clearly, it sounds like premium rate increases are coming in a bit slower but where else are you seeing things diverge from your underlying assumptions?"  Defendants ultimately admitted on September 18, 2018 that lapse assumption contributed to the need for "reserve strengthening of just over $2 billion" and that one of the significant drivers of the reserves change was claims incidence.

## VII.    DEFENDANTS' GAAP VIOLATIONS

### A.    Defendants' Material Financial Misstatements

156.    By 4Q2016, Defendants knew of, or recklessly disregarded,  the adverse inputs and assumptions they would later apply in Unum's mid-2018 long-term care reserve analysis and reserve increase.  Defendants falsely stated in Unum's Form 10-K for December 31, 2016, Forms 10-Q for 1Q2017, 2Q2017, and 3Q2017, and in Unum's Form 10-K for December 31, 2017 that "[w]e prepare our financial statements in accordance with GAAP."[3]  The Defendants stated in Form 10-K for the period ended December 31, 2016 that their preparation of financial statements in conformity with GAAP required them "to make estimates and assumptions that affect amounts in our financial statements and accompanying notes."  The Defendants also stated that "[t]he accounting estimates

---

[3]    GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

deemed to be *most critical* to our financial position and results of operations are those related to *reserves for policy and contract benefits* [among other items]." Defendants falsely and misleadingly stated, however, that the "[e]stimates and assumptions *could* change in the future as more information becomes known, which *could* impact the amounts reported and disclosed in our financial statements."

157. These statements were false and misleading because for 4Q2016, Defendants already possessed information that the $668.2 million pretax long-term care benefits reserve increase and the corresponding $453.8 million post-tax charge to GAAP earnings that Unum recognized as of 4Q2014 was not only insufficient, but vastly understated by 4Q2016. Had Defendants prepared their financial statements in accordance with GAAP, they would have incorporated estimates and assumptions that properly reflected the specific facts and circumstances pertinent to the long-term care component of their Closed Block segment. These deficiencies also affected the accuracy of financial results reported in Unum's Form DEF 14A Proxy Statement filed with the SEC on April 12, 2018. Accordingly, for the period ended 4Q2016, Defendants should have increased the long-term care benefits reserve by at least an additional $750.8 million pretax and $593.1 million post-tax.

158. These misstatements were material to investors because misstatements or omissions representing 5% or more of reported financial items are deemed to be material, although amounts less than 5% can also be material depending upon the facts and circumstances.[4] The following chart shows the Company's key reported financial results and accounts as of December 31, 2016:

---

[4] "The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material." SEC Staff Accounting Bulletin No. 99; ASC 250-10-S99-1. "Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the [SEC] staff believes that there are numerous circumstances in which misstatements below 5% could well be material." *Id.*

| Misstatement of Key Financial Results for the Fourth Quarter of 2016 | | | |
|---|---|---|---|
| (*in millions, except per share data and percentages*) | | | |
| | Reported | Actual | Percent Misstatement |
| Net Income (Loss) | $248.0 | ($345.1) | -239% |
| EPS - Basic | $1.07 | ($1.49) | -239% |
| EPS - Diluted | $1.07 | ($1.48) | -239% |
| Consolidated Benefits and Expenses | $2,425.3 | $3,176.1 | 31% |
| Closed Block Benefits and Expenses | $621.4 | $1,372.2 | 121% |
| Closed Block Operating Income (Loss) | $34.6 | ($716.2) | -2170% |
| Long-term Care Benefits Reserve Increase | $0.0 | ($750.8) | N/A |
| Long-term Care Benefits Reserve Increase, Net of Tax | $0.0 | ($593.1) | N/A |
| Consolidated Total Stockholders' Equity | $8,968.0 | $8,374.9 | -7% |
| Closed Block Total Allocated Stockholders' Equity | $3,608.8 | $3,015.7 | -16% |

159.    Moreover, by failing to increase the long-term care benefits reserve by at least $750.8 million pretax and the corresponding post-tax $593.1 million charge to earnings in Unum's financial statements for December 31, 2016, Defendants also materially understated the long-term care benefits reserve and the corresponding charge to earnings in subsequent quarterly reporting periods. The following charts shows the magnitude of Unum's financial misstatements and their material impact on the Company's key reported financial results and accounts as of 1Q2017, 2Q2017, 3Q2017 and 4Q2017:

| Misstatement of Key Financial Results for the First Quarter of 2017 | | | |
|---|---|---|---|
| (*in millions, except per share data and percentages*) | | | |
| | Reported | Actual | Percent Misstatement |
| Net Income (Loss) | $229.9 | ($363.2) | -258% |
| EPS - Basic | $1.00 | ($1.58) | -258% |
| EPS - Diluted | $1.00 | ($1.58) | -258% |
| Consolidated Benefits and Expenses | $2,476.2 | $3,227.0 | 30% |
| Closed Block Benefits and Expenses | $611.4 | $1,362.2 | 123% |
| Closed Block Operating Income (Loss) | $31.6 | ($719.2) | -2376% |
| Long-term Care Benefits Reserve Increase | $0.0 | ($750.8) | N/A |
| Long-term Care Benefits Reserve Increase, Net of Tax | $0.0 | ($593.1) | N/A |
| Consolidated Total Stockholders' Equity | $9,107.4 | $8,514.3 | -7% |
| Closed Block Total Allocated Stockholders' Equity | $3,591.6 | $2,998.5 | -17% |

| Misstatement of Key Financial Results for the Second Quarter of 2017 | | | |
|---|---|---|---|
| **(*in millions, except per share data and percentages* )** | | | |
| | Reported | Actual | Percent Misstatement |
| Net Income (Loss) | $245.1 | ($348.0) | -242% |
| EPS - Basic | $1.08 | ($1.53) | -242% |
| EPS - Diluted | $1.07 | ($1.53) | -242% |
| Consolidated Benefits and Expenses | $2,460.4 | $3,211.2 | 31% |
| Closed Block Benefits and Expenses | $609.0 | $1,359.8 | 123% |
| Closed Block Operating Income (Loss) | $32.6 | ($718.2) | -2303% |
| Long-term Care Benefits Reserve Increase | $0.0 | ($750.8) | N/A |
| Long-term Care Benefits Reserve Increase, Net of Tax | $0.0 | ($593.1) | N/A |
| Consolidated Total Stockholders' Equity | $9,316.6 | $8,723.5 | -6% |
| Closed Block Total Allocated Stockholders' Equity | $3,681.9 | $3,088.8 | -16% |

| Misstatement of Key Financial Results for the Third Quarter of 2017 | | | |
|---|---|---|---|
| **(*in millions, except per share data and percentages* )** | | | |
| | Reported | Actual | Percent Misstatement |
| Net Income (Loss) | $252.3 | ($340.8) | -235% |
| EPS - Basic | $1.12 | ($1.51) | -235% |
| EPS - Diluted | $1.12 | ($1.51) | -235% |
| Consolidated Benefits and Expenses | $2,452.3 | $3,203.1 | 31% |
| Closed Block Benefits and Expenses | $612.0 | $1,362.8 | 123% |
| Closed Block Operating Income (Loss) | $26.6 | ($724.2) | -2823% |
| Long-term Care Benefits Reserve Increase | $0.0 | ($750.8) | N/A |
| Long-term Care Benefits Reserve Increase, Net of Tax | $0.0 | ($593.1) | N/A |
| Consolidated Total Stockholders' Equity | $9,448.6 | $8,855.5 | -6% |
| Closed Block Total Allocated Stockholders' Equity | $3,760.9 | $3,167.8 | -16% |

| Misstatement of Key Financial Results for the Fourth Quarter of 2017 | | | |
|---|---|---|---|
| **(*in millions, except per share data and percentages* )** | | | |
| | Reported | Actual | Percent Misstatement |
| Net Income (Loss) | $266.9 | ($326.2) | -222% |
| EPS - Basic | $1.19 | ($1.46) | -222% |
| EPS - Diluted | $1.19 | ($1.45) | -222% |
| Consolidated Benefits and Expenses | $2,493.9 | $3,244.7 | 30% |
| Closed Block Benefits and Expenses | $606.7 | $1,357.5 | 124% |
| Closed Block Operating Income (Loss) | $33.1 | ($717.7) | -2268% |
| Long-term Care Benefits Reserve Increase | $0.0 | ($750.8) | N/A |
| Long-term Care Benefits Reserve Increase, Net of Tax | $0.0 | ($593.1) | N/A |
| Consolidated Total Stockholders' Equity | $9,574.9 | $8,981.8 | -6% |
| Closed Block Total Allocated Stockholders' Equity | $3,921.4 | $3,328.3 | -15% |

## B. Defendants Misled Investors About the LTC Reserve

160.    Defendants knowingly or recklessly misled investors about the factors actually triggering the need for an increase in the long-term care benefits reserve by focusing primarily on Unum's long-term care interest adjusted loss ratio.[5]  For example, when Defendants were questioned by financial analysts during Unum's 4Q2014 conference call about the potential need for another long-term care reserve charge, in addition to the $668.2 million pretax reserve increase and $453.8 million post-tax charge that was taken in 4Q2014, McGarry stated that "longer-term we expect the long-term care loss ratio to hover in [the] 85% to 90% range" and that "if it were outside that range [that is, above that range] *for a prolonged period of time*, it would begin to put pressure on the reserve assumptions."  Investor Conference Call, December 16, 2014.  Given McGarry's warning, investors would naturally be alert to any significant increase in the long-term care loss ratio as a harbinger of an increase in the long-term care loss reserve.

161.    But even when the long-term care loss ratio was greater than 90%, such as occurred in 2Q2016 when the loss ratio was 92.6%, in 3Q2016 when the loss ratio was 93.8%, and for the full FY2016 when the loss ratio was 91.1%, Defendants essentially dismissed that adverse indicator. Instead, Defendants disingenuously recharacterized the circumstances as a blip or an instance of "volatility," rather than admit that a 91.1% loss ratio for FY2016 was tantamount to a "prolonged period of time" for the long-term care loss ratio to be above 90%.[6]  According to Defendants, "[l]ong-term care experienced volatility during the second and third quarters of 2016, with a resulting interest adjusted loss ratio for full year 2016 that was slightly higher than our range of

---

[5]    Unum's long-term care loss ratio was equal to its actual incurred claims divided by its earned premiums.  The long-term care loss ratio is one of the metrics closely followed by Unum's investors.

[6]    McGarry also disingenuously tried to dismiss the 93.8% loss ratio in 3Q2016 as a one-time event.  "The long-term care loss ratio was elevated [in 3Q2016] due to the termination of our largest group case, which also had a unique auto-portability feature. . . .  In the absence of this event, the long-term care loss ratio would have been in the upper end of our 85% to 90% range."

expectations." "We do have some information here just about our adjusted interest adjusted loss ratio for long-term care. We do look to have that be in that 85% to 90% range. It's been very volatile over time, sometimes below, sometimes above."

162. Defendants made these statements while knowingly or recklessly disregarding that the Company's LTC Closed Block component was facing far more adverse facts and circumstances than they disclosed. Defendants knew that Unum's LTC policyholders, for example, were receiving much greater LTC benefits than the Company was originally expecting and for significantly longer periods of time. And Defendants knew that policyholders were continuing to maintain their LTC policies for longer periods of time, producing unfavorable lapse and persistency rates and increasing the trend toward greater incidence of claims in the future. Nonetheless, Defendants continued to make false statements at the time, claiming, for example, that "when trends have deviated from our assumptions, we've updated them accordingly."

## C. GAAP Applicable to Reserve Calculations

163. GAAP prohibits LTC insurance companies from improperly overstating earnings by basing reserve calculations on inaccurate inputs or invalid assumptions. As explained in the American Institute of Certified Public Accountants' *Audit and Accounting Guide for Life and Health Insurance Entities* ("AAG"), "[t]he selection of actuarial assumptions affects the incidence of reported profits for traditional life and health insurance products. If the GAAP assumptions are too optimistic, earnings could be overstated in the early years of the contract and understated in the later years."

164. Importantly, Unum's long-term care reserves represent a "[l]iability for *[f]uture* [p]olicy [b]enefits."[7] GAAP requires LTC insurance companies to review their experience data

---

[7] "Liability for Future Policy Benefits" is defined as "[a]n accrued obligation to policyholders that relates to insured events, such as death or disability." ASC 944-40-20.

often, and obligates them to use current data and account for known trends in updating their reserves. In setting and updating reserve levels, GAAP prohibits companies from relying on stale or inappropriate data that does not reflect current facts and circumstances. GAAP also precludes companies from doing occasional or cursory reserve reviews. GAAP provides that "*[a]n insurance entity shall regularly evaluate estimates used and adjust the additional liability balance, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised*." *See* ASC-944-40-35-9.

165. When LTC insurance companies conduct their reviews of long-term care reserves, GAAP requires that they collect all available experience data, including policy-level data and claim development data, in accordance with ASC 944-40-30-1 and ASC 944-40-35-9. They are required to review that experience data and calculate the average duration of claims and lapse rates on their policies, as discussed in ASC 944-40-30-1 and the AICPA's AAG, §§7.58 to 7.71.

166. These metrics require management's close attention and careful calculation because the average duration of claims, the policy lapse rates, the persistency rates, and, ultimately, the actual incurred claims that the company experiences, along with the corresponding premiums, determine the profitability of the company's LTC insurance policies. An insurance company reviewing its reserves is required to compare its experience data with the original inputs for its LTC insurance reserves. *See* ASC 944-40-35-9. To the extent that the company's experience data is inconsistent with its original inputs, the company is required to change its inputs and assumptions and, where necessary, to increase its reserves. *See* ASC 944-40-35-10. For example, when a company finds that the average duration of its claims is greater than its original calculations, GAAP requires the company to promptly revise the input and increase its reserves to account for its new experience data. *See* ASC 944-40-35-9 to 11.

167. As discussed below, Defendants misled investors into believing that they appropriately monitored Unum's reserves and adjusted them to account for their actual, current experience data. Instead, Defendants based their reserves on data that did not reflect Unum's actual facts and circumstances. Defendants failed to comply with GAAP that required them to "regularly evaluate estimates used and [to] adjust the additional liability balance . . . with a related charge . . . if actual experience or other evidence suggests that earlier assumptions should be revised," as stated in ASC 944-40-35-9. Defendants misstated the Company's reserves by failing to increase the long-term care benefits reserve by at least $750.8 million pretax and by failing to recognize the corresponding post-tax $593.1 million charge to earnings in Unum's reported financial statements as of December 31, 2016. Defendants also understated the long-term care benefits reserve and the corresponding charge to earnings in subsequent quarterly reporting periods by the same amounts.

### D. Defendants Failed to Timely Address Adverse Trends Affecting the Reserve

168. Defendants knew or recklessly disregarded as of December 31, 2016, that the die was already cast and that the adverse trend was already locked in place for the Closed Block segment's actual incurred LTC claims experience. Additionally, with each passing quarter after 4Q2016, Defendants' own actual claims experience data confirmed to Defendants that the previous long-term care reserve increase taken in FY2014 was insufficient as of December 31, 2016, and would need to be increased by at least $750.8 million on a pretax basis and $593.1 million on an after-tax basis.

169. Among Unum's Closed Block segment's powerful adverse long-term care trends from FY2009 through FY2016, and continuing through FY2017, were the levels of actual individual and group LTC incurred claims and Unum's expected incurred claims. Unum's actual and expected incurred LTC claims rose substantially in virtually every year, and the ratio of actual to expected incurred claims had exceeded 100% in every year by substantial amounts (with the exception of fiscal year 2016). Additionally, the dollar amount of incurred claims for Unum's individual policies

- 82 -

was 121% higher than the amounts which formed the basis for the Company's reserves. Defendants thus knew or recklessly disregarded that as of 4Q2016, their original LTC claims expectations were wildly optimistic and that they needed to drastically reduce their inflated expectations and immediately adjust their inputs and assumptions to accurately reflect the adverse and inexorable trends already underway from fiscal years 2014 through 2016.

170. Although Defendants publicly focused on the long-term care loss ratio as the primary driver of increases to the long-term care benefits reserve, Defendants knew that the ***numerator*** of the loss ratio, the actual incurred LTC claims experience level, was the ***primary*** driver behind a reserve increase because the long-term care premiums in the denominator of the loss ratio, which were heavily dependent upon state regulatory approved rate increases, did not keep pace with the actual incurred LTC claims level and were unlikely to do so in the future. For example, as McGarry acknowledged in the Investor Conference Call on April 27, 2017, "[o]ur reserve assumptions only factored in rate increase requests related to our 2014 program. . . . We have not factored in any benefit from rate increases that we expect to file for in the future." McGarry reiterated this point in a later conference call on February 1, 2018. "It bears repeating that we assume no future rate increases in our current reserve assumptions, though we intend to actively pursue rate increases where justified." But Defendants knew by the beginning of the Class Period in October 2016 that Unum's rate increase requests in a vast number of states were met with disapprovals, approval delays, phase in requirements, and implementation delays – resulting in rate increases significantly below Unum's historical experience and reserve assumptions. By focusing on the long-term care loss ratio, therefore, Defendants deliberately misled investors, and it became Defendants' excuse to postpone increasing the long-term care reserve to its proper level. Using the long-term care loss ratio as a pretext for delaying the increase in the long-term care benefits reserve was specious because the loss ratio was already above 90% for a "***prolonged period of time***" and because the long-term adverse

trend for Unum's actual incurred LTC claims experience level and Unum's failure to achieve projected rate increases were already manifest as of 4Q2016, as explained in detail below.

171.    As McGarry would later admit in a conference call on February 1, 2018, "in long-term care, it's a long-term thing. It's not what happens this quarter. You're predicting things out over the next 40 and 50 years. And really, that has to do with how a lot of different assumptions interplay." McGarry would also later add that "you can't judge old-age mortality [one such assumption] by what happens in 1 or 2 quarters. You need to go through a full cycle, judge it on annual and quinquennial kinds of looks at it [that is, assess the inputs and assumptions over a five-year period]."

172.    In a later conference call on July 31, 2018, McGarry would essentially admit that the long-term trend reflected in the numerator of the long-term care loss ratio was the primary driver of the increases to the long-term care benefits reserve:

> So certainly, we've incorporated recent claims experience into our reserve analysis. [But] [l]ong-term care is a very long-term product line. [Two] 2 quarters [alone] isn't [*sic*] very credible [for the long-term care reserve analysis] relative to the long-term trend lines. We tend to look at those multiyear periods. So certainly, . . . [short-term factors] do[] have some impact and influence[] the outcome, but it's not a major driver of the [reserve increase] outcome.

173.    When the Defendants described their analysis of the long-term care reserve in the Management's Discussion and Analysis of Financial Position and Results of Operations ("MD&A") section of the Company's Form 10-K for the period ended December 31, 2016, they acknowledged that many of the key inputs and assumptions, such as morbidity, mortality, and persistency, were driven by Unum's actual, historical incurred LTC claims experience. "Claims incidence and claim resolution rate assumptions related to mortality and morbidity are based on actual experience or industry standards adjusted as appropriate to reflect our actual experience and future expectations." "Persistency assumptions are based on our actual historical experience adjusted for future expectations."

- 84 -

174.     And when Defendants belatedly recognized the $750.8 million pretax and $593.1 million after-tax long-term care reserve increase for 3Q2018, Defendants stated in a presentation that "*[u]pdated assumptions reflect the elevated levels of incurred claims experienced recently*." Although Defendants falsely attributed the "[u]pdated assumptions" in their belated 3Q2018 long-term care reserve increase to "*recent*[]" "elevated levels of incurred claims experienced," Defendants knew or recklessly disregarded that the reserve calculation was based on an assessment of the "*annual and quinquennial*" and "*long-term trend lines*" of Unum's actual incurred LTC claims experience, as Defendants admitted elsewhere. Additionally, Defendants knew that the long-term care loss reserve was a liability for *future* policy benefits that Unum would be required to pay. Consequently, as explained below, Defendants well knew or recklessly disregarded as of 4Q2016 that those "*elevated levels of incurred claims*" would inevitably be reached in less than two years – but they failed to revise their inputs and assumptions until more than a year later.

**E.     Unum's Adverse Trends Required an Increase to Reserves Effective 4Q2016**

175.     As shown in the chart below, based on Unum's actual annual sequentially increasing incurred individual and group LTC claims over the last eight years as of December 31, 2016, the actual incurred claims were projected to be approximately $460 million in FY2017 *and between $500 million and $520 million in 2018*.



**2017 to 2018 Projection of Unum's Actual Incurred Individual and Group LTC Claims Based on Unum's Actual Incurred LTC Claims 2009 to 2016 (in millions of dollars)**

R² = 0.9693

176.    The projection above was statistically generated from the actual known data points, which correspond to the actual incurred LTC claims from 2009 to 2016.  The projection curves upward because the actual data points are strongly correlated with the projection, with a coefficient of determination value of 0.9693.[8]  And, in fact, Unum's actual incurred individual and group LTC claims in FY2017 were about $470 million, only about 2.2% more than the $460 million FY2017 projected claims predicted above.

177.    When the projection is updated below to include all of the available data points from fiscal years 2009 through 2017, ***the projected incurred claims level for FY2018 continued to remain between $500 million and $520 million***, and the coefficient of determination is nearly 98%, demonstrating the continued reliability of the model.

---

[8]    A coefficient of determination or value R² (R squared) of 1.0 indicates perfect correlation of the data and a hypothetical value of zero indicates no correlation.  The R² (R squared) value specifically indicates the overall effectiveness of the entire set of independent variables in explaining the total variation in the dependent variable.  Thus, in this case, since the R² is 0.9693 or nearly 97%, this means that only 3% of the total variation in the dependent variable cannot be collectively explained by the independent variables.

- 86 -



**2018 Projection of Unum's Actual Incurred Individual and Group LTC Claims Based on Unum's Actual Incurred LTC Claims 2009 to 2017 (in millions of dollars)**

$R^2 = 0.9783$

The data in the chart above demonstrates that all of the adverse inputs and assumptions that Defendants applied in their early FY2018 long-term care reserve analysis to belatedly recognize the $750.8 million pretax and $593.1 million after-tax increase to the reserve were *already* known to Defendants or recklessly disregarded as of 4Q2016. The data and projections also demonstrate that Defendants had ample evidence with each succeeding quarter that they were deliberately postponing the inevitable reserve charge.

## F. Defendants Attempted to Conceal Their Knowledge of Adverse Trends

178. Defendants also attempted to conceal the fact that the adverse inputs and assumptions that they applied in FY2018 were already known as of December 31, 2016 by backpedaling and claiming for the first time in FY2018 on June 12, that they relied on industry assumptions, rather than their own actual closed block experience levels, even as they assured investors throughout the Class Period that their Closed Block segment did not have the problems that other insurers in the industry were experiencing. "***When we took the reserve charge in 2014, we were experiencing longer claim durations than the industry was. We made an assumption that we would revert***

*toward the industry norm over time and look[ed] at a weighting between us and the – and industry*

*table.  Unfortunately, I think, the industry has reverted toward us*."

179.    While Defendants may claim that they believed as of 4Q2014 that Unum's claims duration would "revert" toward the "industry norm," rather than the other way around, Defendants knew or recklessly disregarded by 4Q2016 that the "industry norm" had ***already*** "revert[ed]" to a level resembling Unum's.  Defendants, therefore, knew that their assumptions regarding the claims duration as of the 4Q2014 reserve analysis were outdated and inappropriate to use as of 4Q2016.  Consequently, Defendants also knew that their boilerplate statements in their Form 10-K and Form 10-Q filings throughout the Class Period, where they claim, for example, that "[w]e continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly," was false and misleading.

180.    To illustrate, the following charts show the respective projections for Unum's actual incurred LTC claims for the year ended December 31, 2014 and the industry's actual incurred LTC claims through the year ended December 31, 2013:



**2015 to 2018 Projection of Unum's Actual Incurred Individual and Group LTC Claims Based on Unum's Actual Incurred LTC Claims 2009 to 2014 (in millions of dollars)**

R² = 0.9887



**2014 to 2018 Projection of Annual Industry Incurred LTC Claims Based on Actual Industry Incurred LTC Claims 2007 to 2013 (in billions of dollars)**

R² = 0.9866

181.    As the two charts above demonstrate, Unum's actual incurred LTC claims are rising steeply at a substantially greater rate than the industry's actual incurred LTC claims.  So, when Defendants belatedly claimed that they believed that Unum's claims durations would "revert" to the "industry norm," this was tantamount to saying that they believed that Unum's and the industry's respective rates of growth and projections would resemble one another in the near future.  And this is

precisely what happened – but as of ***December 31, 2016*** – even though the "industry norm" actually "revert[ed]" to Unum's claims level, rather than the other way around.

182.     As the two charts below demonstrate, Unum's and the industry's respective rates of growth for actual incurred LTC claims resemble one another by 4Q2016, with similar upward sloping projections, in contrast to the respective rates of growth and projections based on data known as of 4Q2014:





183.     These two charts confirm that Unum's and the industry's respective rates of growth for actual incurred LTC claims resemble one another as of 4Q2016.  Therefore, even if it were true that Defendants believed as of 4Q2014 that Unum's LTC claims rate of growth would "revert" to the

industry's rate of growth, Defendants knew by 4Q2016 that they had no basis for continuing to believe that Unum's actual claims would improve to the industry's level. The industry's so-called reversion to Unum's claims growth rate had already taken place by 4Q2016. This was especially the case with each succeeding quarter after 4Q2014, as the evidence mounted that Unum's Closed Block reflected trends that were more adverse than the industry experienced.

184. Moreover, Defendants' attempt to blame their delay of the reserve increase on their use of industry assumptions is *contradicted* by their own statements. McGarry said in the Investor Conference Call on October 27, 2016, for example, "*[i]n 2014 we reset reserve assumptions. We placed those reserve assumptions on a best estimate basis using our current own experience, and our experience since then has been consistent with those expectations*." "Claim incidence and claim resolution rate assumptions related to morbidity and mortality are based on [*our*] actual experience or industry standards adjusted as appropriate to reflect *our* actual experience and future expectations." Form 10-K for the period ended December 31, 2016. "Persistency assumptions are based on *our* actual historical experience adjusted for future expectations." *Id*. "Claim resolution assumptions involve many factors, including the cause of disability, the policyholder's age, the type of contractual benefits provided, and the time since initial disability. We primarily use *our own* claim experience to develop our claim resolution assumptions." *Id*.

### G. GAAP Conclusions

185. Defendants violated GAAP by failing to apply inputs and assumptions already known to them as of 4Q2016. And, Defendants had ample evidence with each succeeding quarter that they were deliberately postponing the inevitable long-term care reserve charge. As the above evidence demonstrates, Defendants knew or recklessly disregarded that the adverse inputs and assumptions that Defendants belatedly applied in their mid-2018 long-term care reserve analysis to ultimately recognize the $750.8 million pretax and $593.1 million after-tax increase to the long-term care

reserve were known as of 4Q2016.  Defendants knew or recklessly disregarded that using long-term

care loss ratios as a trigger for recognizing the enormous loss all-at-once in the 3Q2018 was

specious.  Defendants knew by 4Q2016 that: (1) the long-term care loss ratios had already exceeded

the 90% range throughout most of fiscal year 2016; (2) the dollar amount of incurred claims for its

individual policies was 121% higher than the amounts which formed the basis for Unum's reserves;

(3) the actual incurred group and individual claims were projected to be between $500 million and

$520 million in fiscal year 2018; and (4) the rate increases from state regulators were being delayed,

denied, and reduced.

## VIII.   DEFENDANTS' VIOLATION OF ITEM 303

### A.   Defendants Failed to Fulfill the Purpose of the MD&A Sections of Unum's SEC Filings

186.   Defendants used the MD&A sections in Unum's SEC filings during the Class Period

to falsely and misleadingly convey to investors that nothing material had changed in the Company's

Closed Block segment, when the performance of the LTC component of the Closed Block had, in

fact, materially deteriorated, requiring an increase to the long-term care reserve as of at least

December 31, 2016.

187.   The federal rules for preparing the MD&A sections in a company's SEC filings are

described in Item 303.  The SEC provides additional guidance for preparing MD&A sections in the

SEC's Division of Corporate Finance Financial Reporting Manual ("SEC Manual") and in the SEC's

"Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of

Financial Condition and Results of Operations," 17 C.F.R. §§211, 231, 241 [Release Nos. 33-8350;

34-48960; FR-72].

188.   The SEC Manual states that the purpose of the MD&A "is [to provide] a narrative

explanation of the financial statements and other statistical data that the registrant believes will

*enhance* a readers' understanding of its financial condition, changes in financial condition and

results of operation." SEC Manual, §9110.1. Defendants, instead, largely presented redundant, generic or boilerplate disclosures on the status of the Company's Closed Block segment and the long-term care reserve in their MD&A sections of Unum's SEC filings. Defendants thereby falsely and misleadingly conveyed to investors that nothing material had changed in the actual segment outlook for the Closed Block segment and that there were no indications that Unum's long-term care reserve would need to be increased during the Class Period.

189. The SEC Manual states that the objectives of the MD&A are:

a. ***to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management***;

b. to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

c. to provide information about the quality of, and potential variability of, a company's earnings and cash flow so that investors can ascertain the likelihood that past performance is indicative of future performance.

*Id.* In particular, the SEC Manual warns that the "***MD&A should not consist of generic or boilerplate disclosure***. ***Rather, it should reflect the facts and circumstances specific to each individual registrant***." *Id.*, §9110.2.

190. But Defendants knowingly or recklessly failed to comply with the SEC's basic guidance given above. Indeed, contrary to the SEC's guidance, in Unum's Form 10-K for December 31, 2016, Forms 10-Q for 1Q2017, 2Q2017, and 3Q2017, and Unum's Form 10-K for December 31, 2017, Defendants provided "generic or boilerplate disclosure[s]" in the Company's "Segment Outlook" in the MD&A sections for the Closed Block segment that were ***virtually identical*** from quarter-to-quarter and year-to-year.

191. The following language that Defendants used in Unum's Form 10-K for December 31, 2016 was typical of their boilerplate disclosures in the "Segment Outlook" sections of the MD&A in Unum's SEC filings above for the Closed Block segment:

Our strategy for our Closed Block remains substantially unchanged. During 2017, we intend to continue our focus on long-term care premium rate increases and the offer of policyholder options, operational effectiveness, financial analysis, and capital management. Despite continued anticipated premium rate increases in our long-term care business, we expect overall premium income and operating revenue to decline over time as these closed blocks of business wind down. We will likely experience volatility in net investment income due to fluctuations of miscellaneous investment income. We expect the low interest rate environment to continue to place pressure on our earnings and the adequacy of our reserves. We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly.

Profitability of our long-tailed products is affected by claims experience related to mortality and morbidity, investment returns, premium rate increases, and persistency. We believe that the interest adjusted loss ratios for the individual disability and long-term care lines of business will be relatively flat over the long term, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures. We also believe the implementation of our long-term care rate increases contributed to higher claim submissions and may continue to do so in the near term. Claim resolution rates, which measure the resolution of claims from recovery, deaths, settlements, and benefit expirations, are very sensitive to operational and external factors and can be volatile. Our claim resolution rate assumption used in determining reserves is our expectation of the resolution rate we will experience over the life of the block of business and will vary from actual experience in any one period. It is possible that variability in any of our reserve assumptions, including, but not limited to, interest rates, mortality, morbidity, premium rate increases, benefit change elections, and persistency, could result in a material impact on the adequacy of our reserves, including adjustments to reserves established under loss recognition.

192. By repeating essentially the same language in the MD&A above quarter-after-quarter and year-after-year during the Class Period, Defendants falsely and misleadingly conveyed to investors that nothing material had changed in the actual segment outlook for the Closed Block segment when viewed "through the eyes of management." Defendants also falsely and misleading conveyed that they were not aware of any indications that the long-term care reserves were insufficient.

193. Defendants also failed to "reflect the facts and circumstances specific to [the] registrant" regarding the Closed Block segment and the status of the Company's long-term care

reserves in particular.[9]  Examples of the specific facts and circumstances that Defendants failed to

describe and deliberately omitted from their MD&A sections are discussed in detail below.

**B.     Defendants Failed to Disclose Known Trends and Uncertainties in the MD&A Sections of Unum's SEC Filings**

194.    Defendants failed to comply with Item 303's requirements to adequately "describe

. . . known material trends . . . unfavorable [to] the registrant's capital resources" and to "[i]ndicate

. . . expected material changes in the . . . cost of such resources."[10]  And, in particular, Defendants

failed to "[d]escribe . . . known trends or uncertainties that have had or that the registrant reasonably

expects will have a material . . . unfavorable impact on . . . income from continuing operations."

Item 303 specifically warns that "[t]he discussion and analysis shall focus specifically on material

events and uncertainties known to management that would cause reported financial information not

to be necessarily indicative of future operating results or of future financial condition."

195.    Defendants failed to disclose the adverse trends occurring in several of the key

assumptions underlying the adequacy of Unum's long-term care reserves, as reflected in the

increasingly elevated levels of actual incurred LTC claims, which greatly exceeded Defendants' own

expectations.  Defendants knew that Unum's LTC policyholders, for example, were receiving much

greater LTC benefits than the Company was originally expecting and for significantly longer periods

---

[9]     "[T]he point of principles-based disclosure is that companies, and their advisors, need to . . . make sure they're disclosing the relevant, material information about their companies' particular facts and circumstances."  John W. White, Dir. of Div. of Corp. Fin., U.S. Sec. and Exch. Comm'n, The Principles Matter: Options Disclosure (Sept. 11, 2006).

[10]    Although Item 303(a) refers to "full fiscal years," a company is also required to provide relevant discussion and analysis in the MD&A sections of interim period SEC filings "to assess material changes in financial condition and results of operations between the periods . . . except that the impact of inflation and changing prices on operations for interim periods need not be addressed."  Item 303(b).

of time because of unfavorable trends for mortality and morbidity.[11]  For example, Unum's individual actual incurred claims were cumulatively worse than Defendants' expectations during the 2014 to 2017 period by 121%.  And Defendants knew that policyholders were continuing to maintain their LTC policies for longer periods of time, producing unfavorable lapse and persistency rates for Unum and accelerating the trend toward increasingly greater incidence of LTC claims in the future.[12]  For example, many more individual policyholders retained their LTC policies instead of allowing them to lapse – up to 6% greater than Unum's expectations.

196.    Consequently, Defendants' use of redundant, boilerplate language in the MD&A sections of Defendants' SEC filings falsely conveyed to investors that they were not aware of any indications that the long-term care reserves were insufficient at any time during the Class Period. And Defendants also failed to provide information about "the facts and circumstances" that "the registrant reasonably expects will have a material . . . unfavorable impact on . . . income from continuing operations," as required by Item 303(a)(3)(ii).

197.    Instead, Defendants made statements in the MD&A section of the Forms 10-K for December 31, 2016 and December 31, 2017 that were designed to mislead investors into believing that Defendants were not aware of any indications that the long-term care reserves were currently insufficient or even that an increase in those reserves would be required in the near future. Defendants, for example, misleadingly reassured investors in their 2016 Form 10-K that "[o]ur assumption update for mortality incorporated the last three years of Company-specific experience

---

[11]    Mortality is defined as "[t]he relative incidence of death in a given time and place."  ASC 944-40-20.  Morbidity is defined as "[t]he relative incidence of disability due to disease or physical impairment."  *Id.*

[12]    Lapse rates are defined as "[t]he rate at which insurance contracts terminate through failure of the insureds to continue required premium payments."  ASC 944-40-20.  Persistency is defined as "the renewal quality of insurance contracts, that is, the number of insureds that keep their insurance in force during a period."  *Id.*

and emerging trends as well as industry data, where available and appropriate, and reflected

improvements in life expectancies beyond what was initially anticipated in 2011." Defendants also

misleadingly reassured investors in their 2016 Form 10-K that "[o]ur morbidity assumptions were

updated to reflect trends from our own emerging Company experience in claim incidence and

terminations, as well as trends based on available and appropriate industry data and studies." And

Defendants used the following identical misleading statement in the MD&A sections of their 2016

Form 10-K and 2017 Form 10-K: "[G]enerally, we do not expect our mortality and morbidity claim

incidence trends or our persistency trends to change significantly in the short-term, and to the extent

that these trends do change, we expect those changes to be gradual over a longer period of time."

Such redundant, boilerplate language in the MD&A sections of Defendants' SEC filings falsely

conveyed to investors that they were not aware of any indications that the long-term care reserves

were insufficient at any time during the Class Period.

198.     SEC Release No. 33-8350 provides MD&A disclosure guidance that illustrates what

Defendants deliberately chose *not* to do in the MD&A sections of their SEC filings during the Class

Period:

> *One of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties*. Disclosure decisions concerning trends, demands, commitments, events, and uncertainties generally should involve the:
>
> •      consideration of financial, operational and other information known to the company;
>
> •      identification, based on this information, of *known trends* and uncertainties; and
>
> •      *assessment of whether these trends and uncertainties will have, or are reasonably likely to have, a material impact on the company's liquidity, capital resources or results of operations*.

As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

*  *  *

One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain *the likelihood that past performance is indicative of future performance. Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A.*

199. Defendants' MD&A sections in their SEC filings during the Class Period failed to fulfill the fundamental purpose of the MD&A section as the SEC has mandated. Defendants' redundant, boilerplate language in the MD&A sections of Defendants' SEC filings, their failure to disclose "the facts and circumstances surrounding [the] known material trends and uncertainties in [the] MD&A," and their failure to disclose information having "a material . . . unfavorable impact on . . . income from continuing operations" violated the SEC's rules and guidance and falsely conveyed to investors that they were not aware of any indications that the long-term care reserves were insufficient at any time during the Class Period.

## IX. THE RELEVANT TRUTH IS REVEALED

200. Between May and September 2018, the relevant truth concealed by Defendants' fraud was revealed to the market.

201. On May 1, 2018, after the market closed, Unum issued the 1Q2018 Form 8-K with a news release entitled "Unum Group Reports First Quarter 2018 Results." In it, the Company reported that the 1Q2018 loss ratio for its LTC business had ballooned to 96.6%, compared to only 88.6% for the 1Q2017. This marked the third consecutive quarter in which the interest adjusted loss ratio had exceeded the 85% to 90% range, and the fifth of the past eight quarters dating back to 2Q2016. The 1Q2018 loss ratio significantly exceeded even the revised near-term expectations

- 98 -

provided by the Company, signaling a much greater likelihood of losses than investors had been led to believe.

202.    On May 2, 2018, the Company hosted a conference call to discuss its 1Q2018 financial results.  On the call, McGarry stated that numerous issues led to the increased interest adjusted loss ratio, including new claims incidence that "ran much higher than expected," and a "lower level of policy terminations."  In addition, McGarry revealed that Unum's interest adjusted loss ratio had been 3% to 4% higher "in the present past," because Unum had not in fact been receiving rate increases as quickly as require by its GAAP reserve expectations.  McGarry also confirmed that Unum knew that the failure to receive timely rate increases was driving up Unum's interest adjusted loss ratio, and had known this since at least the Company's December 13, 2017 Annual Investor Meeting.

203.    Analysts recognized that the increase in Unum's interest adjusted loss ratio signaled inadequacies in Unum's LTC reserves.  During the call, John Nadel, an analyst at UBS Investment Bank, commented, "the stock is down 15%.  I don't think that has anything to do with a couple of pennies.[13] I think investors are doubting your reserve adequacy.  And so far, my sense is that you're not exhibiting that same level of confidence in the quality of your reserves as you did last quarter."

204.    In a May 2, 2018, report, Mark Hughes, an analyst at SunTrust Robinson Humphrey, stated:

> The developments over the last couple of quarter[s] (***particularly the benefit ratio reported this quarter***) suggest to us increased odds that [a reserve charge] may happen this or next year.  We think the LTC business could be subject to a large reserve charge perhaps similar to or greater than the $454 million (aftertax) taken in 4Q14.

---

[13]    Unum's 1Q2018 EPS missed consensus forecasts by approximately $0.01.

1519354_1

205.     On July 30, 2018, Unum filed a Form 8-K and issued a news release announcing its 2Q2018 financial results. Confirming what the market already understood from Unum's May 1-2, 2018s disclosures, Unum announced that it would indeed be increasing its LTC reserves:

> During the second quarter of 2018, the Company accelerated the work on its long-term care annual reserve analysis, which is now anticipated to be completed in the third quarter of 2018. When completed, this work will incorporate the Company's most recent experience and will include a review of all assumptions. The review will also utilize internal and external data and an outside consulting firm for quality assurance and industry benchmarking. Subject to completion of the work, the Company believes that it may need to increase its reserves for long-term care as part of its third quarter 2018 closing process. Although there is work to be completed and it is still assessing its assumptions, the Company currently expects that any increase will likely be predominately a GAAP event and will likely not exceed $750 million after-tax.

206.     Then, on September 18, 2018, Unum filed a Form 8-K and issued a news release announcing that it had substantially completed its reserve review for its LTC business. Unum reported that it expected to increase its long-term care GAAP reserves in 3Q2018 by approximately $590 million after-tax, or approximately $750 million before-tax. In addition, Unum estimated the impact to its statutory reserves would be approximately $200 million on a before-tax basis.

207.     In reports following the news release and conference call, analysts noted that that Unum's GAAP charge was in line with the expected range Unum indicated in its 2Q2018 results.

208.     However, analysts also stated that the assumptions used by Unum in its reserve review were aggressive. In a September 18, 2018 report, UBS wrote that:

> [W]e expect the stock reaction to continue to be somewhat muted given the continuance of two key assumptions that we would characterize as aggressive relative to peers. AMP [Ameriprise Financial], MET [Metlife] and PRU [Prudential Financial] no longer assume morbidity improvement in statutory reserves, but UNM continues to assume a meaningful benefit from morbidity improvement as well as future premium rate increases (including those not yet filed).

UBS further stated that Unum's morbidity assumptions were "among the most aggressive across the industry."

209. In a September 19, 2018 report, Evercore ISI also stated that Unum's morbidity assumptions were "probably aggressive in our view," and also questioned Unum's assumptions regarding the $1.4 billion of future rate increases Unum projected as part of its reserve increases:

> The gross charge for lower claims terminations and lapses of ~$2.1b was offset by $1.4b of future rate increases, the majority of which are going to be on the younger and better performing group insurance block, which we think may be more difficult to justify given regulators are focused on not allowing recouping past losses/cross subsidization of various blocks of business.

## X. ADDITIONAL SCIENTER ALLEGATIONS

210. As alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the statements alleged herein were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Unum securities as primary violations of the federal securities laws. Defendants are liable for any false or misleading forward-looking statements because, at the time each such statements were made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Unum who knew that the statement was false. Defendants, by virtue of their receipt of information reflecting the true facts regarding Unum, their control over, and/or receipt of Unum's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Unum, participated in the fraudulent scheme alleged herein. The adverse developments at issue impacted the most significant revenue and profitability risks for the Company and the likelihood that Unum would suffer massive losses. The Individual Defendants, in particular, were directly responsible for overseeing and reporting on Unum's Closed Block segment and LTC insurance policies and held themselves out to the market as representatives of the Company knowledgeable on these topics. Accordingly, the Individual Defendants knew or

were reckless in not knowing of the undisclosed facts detailed herein. The following factors also demonstrate Defendants' scienter:

### A. Unum Settled a Class Action Alleging Rampant Fraud Involving Underpayment of Benefits to LTC Insureds

211. In 2015, Unum settled a putative class action alleging that for decades it had committed rampant fraud in miscalculating the benefits it owed to its LTC insured – a fraud which allowed Unum to withhold tens of millions of dollars in payments from its insureds, and likely allowed it to improperly understate its LTC reserves.

212. Originally filed on May 17, 2013 in Los Angeles Superior Court and later removed to federal court, the lawsuit, *Don v. Unum Life Ins. Co. of Am.*, Case No.: CV 13-4502 (C.D. Cal.), alleged that Unum failed to properly calculate LTC benefits in two respects. First, Unum improperly calculated benefits by determining the Policy Anniversary based on the Effective Date of the Policy rather than the Policy Date, thereby delaying benefit increases. Second, Unum improperly calculated benefits on policies with inflation riders by calculating the inflation increase based on the remaining Lifetime Maximum Benefit Amount, even though the word "remaining" does not appear in the inflation protection or benefit increase provision or rider, and therefore improperly decreased the amounts owed to insureds.

213. On August 6, 2014, the Court denied in large part Unum's motion to dismiss, and in November 2015, before a class had even been certified, the parties announced that they had reached an agreement to resolve the action.

214. The papers filed in support of settlement approval reveal that Unum began settlement discussions and mediation efforts in October 2013, mere months after the action was first filed. As part of the settlement, Unum agreed not to contest that the value of the total settlement fund amounted to over $45 million, compromised in large part of additional payments to LTC insureds that Unum would have to make as a result of proper calculation of their LTC benefits.

215.   Unum's quick settlement of this litigation not only supports a strong inference of scienter, but supports an inference that Unum's LTC reserves were understated because of their failure to accurately calculate the benefits Unum owed to its insureds.

216.   Nor is there a reasonable inference that Unum's misconduct was unintentional.  While the court dismissed the plaintiff's fraud claim with leave to replead (noting that "it appears [plaintiff] would be able to" successfully state a claim), it also characterized Unum alleged conduct as "particularly egregious":

> Here, the alleged fraudulent conduct is particularly egregious.  Unum Life allegedly promised certain terms in a long term care policy without any intention of complying with those terms.  Obviously, [plaintiff]–and other similarly situated insureds– would not become aware they had been defrauded until after they had become seriously disabled, were no longer able to care for themselves, and likely had entered into commitments with care providers, etc. based on the terms of the policies.  These insureds might well be less likely and less able to complain about this fraudulent conduct – and less likely and less able to pursue any remedies they might have.  Indeed, in this case, [plaintiff] himself is likely to be placed in conservatorship and was unable pursue any available remedies on his own.

217.   And Unum was keenly aware of the effect inflation riders were having on its reserves. During conference calls, both McGarry and McKenney discussed Unum's efforts to have their insureds voluntarily reduce their inflation riders from 5% to 3% instead of being subject to Unum's ceaseless attempts at rate increases.  McGarry described these efforts as "a very powerful lever . . . in terms of the impact that that can have on the financials of the block."

**B.     Defendants' Admissions Came Shortly After Assuring Investors of the Adequacy of Unum's Reserves**

218.   The closeness in time between Unum's May 1-2, 2018 admissions and the false and misleading statements and omissions alleged herein supports a strong inference of scienter.

219.   On February 21, 2018, Unum filed its 2017 Form 10-K, which included false and misleading statements regarding Unum's success in achieving rate increases, the adequacy of the Company's reserves and the sustainability of the Company's LTC loss ratio.  ¶¶78, 122, 145.

- 103 -

220.     Moreover, on April 12, 2018, mere weeks prior to Unum's May 1-2, 2018 admissions, Unum filed its 2018 Proxy Statement, which was solicited and signed by Unum's Board of Directors, including McKenney.  The 2018 Proxy Statement repeated Unum's inflated FY2017 financial results and asked shareholders to approve millions of dollars in incentive compensation for McKenney and McGarry by falsely highlighting their success in managing the Company's Closed Block operations.  *See* §VII.A.

221.     Particularly in light of the long-term nature of Unum's increasingly negative trends, the closeness in time between Unum's false and misleading statements and omissions and the revelation of the relevant truth, supports a strong inference of scienter.

### C.     Defendants Disregarded Current Factual Information When Seeking to Reassure Investors Regarding Unum's LTC Reserves

222.     In attempting to convince investors that Unum's LTC business was stable, adequately reserved and immune from weaknesses experienced by many of its competitors, Defendants disregarded contemporaneous information that contradicted their public statements.

223.     For example, while repeatedly stating that rate increases were on track with their assumptions, Defendants knew from the actual increases approved (or disapproved) by regulators that they were ***not*** on track to meet their assumptions, causing a 3%-4% increase to their loss ratio. Defendants even admitted that premium increases, or lack thereof, were impacting the loss ratio by at least December 2017, stating during the May 2, 2018 earnings call that they knew there was "some pressure" caused by unrealized premium increases during the Company's annual investor meeting.

224.     Similarly, while emphasizing the conservative plan design of its group policies, as described in §VI.B., Defendants ignored that the Company's individual policies were all trending far worse than the assumptions embedded in the Company's revenues.

225. Nor is there any doubt that Defendants had access to Unum's current financial reporting and actuarial analyses. McKenney stated during a September 9, 2014 conference that Unum manages its LTC block "very closely." During the February 1, 2018 4Q2017 conference call, McGarry stated that Unum tracked its actual to assumed assumptions for its LTC block "on a monthly basis." Unum's financial reporting was available to Unum's executives at all times through its software system, which also included the actuarial assumptions and experiences calculated by Unum's actuaries, as well as loss ratios and reserve calculations. Indeed, during the December 16, 2014 investor meeting, McGarry told investors that Unum "buil[t] some state-of-the-art financial analysis tools and we undertook a comprehensive review of virtually assumption underlying the long-term care block." Watjen further emphasized that the Company put in a lot of resources to ensure that it had "the tools in place to make good pricing decisions and risk assessment decisions." On September 18, 2018, McGarry stated that the internal audit team provided "validation that the detailed assumptions are mechanically accurate in our reserve calculation software and that our actual to expected analysis tools are accurate."

### D. Defendants Refused to Provide Investors With the Information Necessary to Evaluate the Adequacy of Unum's LTC Reserves

226. Beginning even prior to the Class Period, securities analysts repeatedly asked Defendants to provide more detailed information regarding the assumptions and inputs utilized in calculating Unum's LTC reserves so that they could better understand the risks associated with the business line; Defendants consistently refused to answer.

227. For instance, during a March 11, 2015, RBC Capital Markets Financial Institutions Conference,[14] shortly after Unum's 2014 reserve increase, Eric Berg, an RBD Capital Markets analyst, lamented the lack of disclosure regarding Unum's LTC reserve assumptions:

---

[14] Present at the March 11, 2015, RBC Capital Markets Financial Institutions Conference were White and Watjen.

I know that it's unfortunate that you have to talk about long-term care but it is what it is. You have this business. It's going to go away slowly.

Unum was a large player in the business out of the business these days and existing block. Here's my question, it's hard to have a view quite frankly as an analyst in this business, I'm just being very frank with you, it's hard to have a view either positive or negative on your reserves or anybody else's reserves quite frankly. Because from where I sit it wouldn't be an informed view.

Try as I might I can't really get to an informed view. . . .

I don't know what [your] assumptions were before. I don't know what your assumptions are now.

So my question is in all fairness, shouldn't people who follow your stock like myself and investors who own it why should they feel comfortable that this is the last bite of the apple? I understand you cannot be cannot guarantee anything but how can people get as comfortable as possible that this is not going to be just an ongoing thing?

Watjen, Unum's then-President & CEO, had no substantive response, instead contending that Unum takes the business seriously, and puts resources behind it, but that investors would literally just have to trust them: "[T]here's a bit of trust in virtually every reserve . . . hopefully you have faith in the management team."

228.    During the July 28, 2016, 2Q2016 earnings call, Randy Binner, an analyst at B. Riley FBR, Inc., asked McGarry what yield Unum had achieved during 2Q2016 on its LTC reserve investments, to which McGarry refused to provide an answer:

[Randy Binner – Analyst – FBR:] Hey, good morning. Thanks. Just a couple on the yield you've been able to earn against the [LTC].

You mentioned it was over 5%. I was wondering if you could specify exactly what it was in the quarter.

So what was it specifically in the quarter, just so we can track it better, the new money rate for that?

[McGarry:] We don't disclose our new money rates for the quarter.

229.    During Unum's December 16, 2014, Annual Investor Meeting, an audience member noted the "pretty big decline in interest rates this week," and asked McKenney for a sensitivity

- 106 -

analysis regarding charging interest rates as they related to Unum's LTC reserves: "CNA sort of gives them exponential sensitivity analysis to changes in interest rates. How about you guys?" McKenney deflected, "No, we actually don't give that sensitivity."

230.     Even when disclosing the need to increase reserves, Defendants initially refused to disclose specifics regarding their reserve assumptions.

231.     During the May 2, 2018, 1Q2018 earnings call, Erik Bass, an analyst at Autonomous Research, asked McGarry to provide additional sensitivities regarding Unum's mortality and morbidity assumptions, information which McGarry refused to provide:

> [Erik James Bass – Analyst – Autonomous Research LLP:] I had a couple of questions on the long-term care side. Just first, you provided some sensitivities for long-term care reserves to changes in interest rates. I was just hoping you could provide some similar sensitivities to changes and claims trends or changes in mortality or morbidity to just give us a sense of how things change there, what the impact could be on reserves.

> \*         \*         \*

> [McGarry:] Yes. We do sensitivity testing. We had not come out with the same. A lot of it depends not only on the level of persistency in mortality and morbidity but also on the shape of it. So it's a significantly more complicated question than the interest rate change, and we have not publicly disclosed those.

232.     During the same call, Thomas Gallagher, an analyst at Evercore ISI, asked McGarry to quantify the favorable mortality rate Unum saw during the quarter; McGarry refused to do so:

> [Thomas George Gallagher – Analyst – Evercore ISI:] Can you comment on the favorable mortality in the quarter on the long-term care benefit ratio? Can you quantify, at least ballpark, how much of a benefit you thought that was for the quarter?

> [McGarry:] Yes. I mean, we're not going to get into talking about specific assumptions by quarter and how far they benefited or didn't. It was a partial offset to what we saw around incidence in policyholder terminations.

233.     On May 30, 2018, McGarry presented at the Deutsche Bank Global Financial Services Conference. During the conference, an unidentified analyst specifically asked McGarry to disclose more information about Unum's LTC assumptions, to which McGarry did not specifically

- 107 -

1519354_1
Case 1:18-cv-00128-TAV-CHS   Document 37   Filed 01/15/19   Page 111 of 123   PageID #: 397

respond, instead discussing how Unum ran its business in general, and blaming Unum's losses on

GE:

> [Unidentified Analyst:] [T]he rest of the business is running great, Josh, there's no questions on it, except the stock is, in my view, still reacting to LTC. And I have to go down to the last line of my model and look at the loss ratio at the end of the quarter and I get a sense of maybe, which way the stock is going to react. Is there – do you think there's more you can do on your end? Because the sensitivity has gotten feverish around this issue where you could say more, you can disclose more? I mean maybe one extreme is putting more capital into the business, if, like you said, you're not handcuffed by accounting, which is maybe – are you doing what GE did, bury this for the next 10 years so as not deal with this as the new CEO? I mean, is there something more you can do to get people away from this issue? To focus back on everything else in the company that's seemingly doing pretty well?

234. Defendants' refusal, and failure, to disclose information regarding its LTC

assumptions and reserves in a manner that would allow investors to scrutinize its practices supports a

strong inference of scienter

### E. McKenney and McGarry's Incentive Compensation Was Tied to the Operating Results of Unum's LTC Business

235. McKenney and McGarry were specifically motivated to engage in the misconduct

alleged herein because portions of their compensation during the Class Period were specifically tied

to the performance, or perceived performance, of Unum's LTC business.[15]

236. McKenney's incentive compensation was specified tied to the reported success of

Unum's LTC business. During FY2016, Unum's Compensation Committee listed McKenney's

"significant progress developing and executing the company's long-term Closed Block strategy," as

one of the accomplishments justifying McKenney's large incentive compensation awards. These

awards, totaling over $7.3 million in value, dwarfed McKenney's annual salary, which amounted to

less than $1 million during FY2016. In FY2017, Unum's Compensation Committee listed "ongoing

---

[15] Unum did not disclose the bases for awarding incentive compensation to Zabel and Waxenburg.

stability in Closed Block operations," as one of the reasons justifying still greater incentive compensation, this time totaling over $8.1 million, compared to an annual salary of $1 million.

237. McGarry's incentive compensation was also tied to the reported success of LTC. During FY2017, the Compensation Committee listed McGarry's "focus on the Closed Block which includes financial performance within expectations," as one accomplishment justifying over $1.8 million in incentive compensation, compared to an annual salary of $623,000.

## XI.    LOSS CAUSATION AND ECONOMIC LOSS

238. Prior to and during the Class Period, Defendants engaged in a scheme to defraud and issued materially false and misleading statements and omissions concerning the Company's true operational condition.

239. The conduct alleged herein and the materially false and misleading statements and omissions made before and during the Class Period caused Unum's common stock to trade at inflated prices as high as $58.73 per share during the Class Period – and operated as a fraud or deceit on investors in the Company's common stock.

240. Later, when the relevant truth was disclosed, Unum's stock price suffered a significant decline, as the artificial inflation came out of the stock price.

241. Specifically, on May 1, 2018, after the market closed, Unum issued the 1Q2018 Form 8-K with a news release titled "Unum Group Reports First Quarter 2018 Results." In it, the Company reported that the 1Q2018 loss ratio for its LTC business had ballooned to 96.6%, compared to only 88.6% for 1Q2017. This marked the third consecutive quarter in which the interest adjusted loss ratio had exceeded the 85% to 90% range, and the fifth of the past eight quarters dating back to Unum's 2Q2016. The 96.6% loss ratio for 1Q2018 significantly exceeded even the revised near-term expectations provided by the Company, clearly indicating that the Company's LTC reserves were inadequate.

242.     On May 2, 2018, the Company hosted a conference call to discuss its 1Q2018 financial results.  During the call, McGarry told investors that the premiums Unum received from approved rates increases had fallen short of the projections incorporated into Unum's GAAP reserve expectation, increasing Unum's reported loss ratio "by 3% to 4%."  In addition, McGarry further stated that claims experience "was driven by new claim incidence that ran much higher than expected" and "the higher loss ratio this quarter was negatively impacted by a lower level of policy terminations."

243.     On this news, the price of the Company's stock fell $8.12 per share, or nearly 17%, to close at $39.78 per share on May 2, 2018, on abnormally high trading volume.

244.     Analysts recognized that the increase in the long-term care loss ratio signaled inadequacies in Unum's LTC reserves.  During the May 2, 2018 conference call, John Matthew Nadel, an analyst at UBS Investment Bank stated "investors are doubting your reserve adequacy":

> [John Matthew Nadel – Analyst – UBS Investment Bank:] So I guess more of a big picture question.  Last quarter, Jack, I feel like you were really specific about all of the reasons why Unum's approach to the long-term care business was still vastly different from GE and what occurred at GE in terms of the more than doubling of their long-term care reserves is just not something that we should think could happen for Unum.  This quarter, we're seeing some elevated near-term loss ratio and a higher claims incidence.  And I don't know, maybe that cost you guys a couple of pennies versus expectations.  But the stock is down 15%.  I don't think that has anything to do with a couple of pennies ***I think investors are doubting your reserve adequacy***.  And so far, my sense is that you're not exhibiting that same level of confidence in the quality of your reserves as you did last quarter.

245.     In a May 2, 2018 report, Mark Hughes, an analyst at SunTrust Robinson Humphrey, stated:

> The developments over the last couple of quarter (***particularly the benefit ratio reported this quarter***) suggest to us increased odds that [a reserve charge] may happen this or next year.  We think the LTC business could be subject to a large reserve charge perhaps similar to or greater than the $454 million (aftertax) taken in 4Q2014.

246.    The timing and magnitude of the decline in Unum's stock price negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  At the same time Unum's stock price fell nearly 17% as a result of Defendants' fraud being revealed, the S&P 500 declined less than 0.1%, and Unum's selected industry sub-index, the S&P Life and Health Index, fell less than 1.8%.  Indeed, the decline occurred despite the fact that the remainder of Unum's results were consistent with investor expectations.  In a May 1, 2018 report Sean Dargon, a Wells Fargo Securities analyst stated: "We think the market will focus on poor results in Unum's runoff long-term care (LTC) book . . . we expect UNM shares to be weak tomorrow."  Mark Dwelle, as analyst as RBC Capital Markets stated: "While Q1 results were generally in line, the concern turned to [Unum's] long-term care (LTC) business given an elevated loss ratio in the quarter."  Thomas Gallagher, an analyst at Evercore ISI, stated:

> While underwriting experience for the ongoing businesses was roughly in-line or slightly favorable in some segments, we think the main focus this quarter will be on the long term care loss ratio, which was 96.6%, 8 points higher from a year ago and above their guide of low 90s as a result of higher claims incidence and unfavorable policy terminations partially offset by favorable mortality experience.  We note that this deterioration in the loss ratio comes in a quarter where mortality was particularly severe and thus we would have expected more stability in the loss ratio, particularly after other LTC underwriters such as AMP, CNO [CNO Financial Group], and CNA [CNA Financial Corp.] reported better year over year LTC results as a result of the elevated mortality.

247.    Like other members of the Class who purchased Unum securities at artificially inflated prices during the Class Period, Plaintiff suffered an economic loss, *i.e.*, damages, when Unum's stock price declined following these disclosures.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE

248.    A presumption of reliance is appropriate in this action under the Supreme Court's holding in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  At all relevant times, the markets for Unum securities were efficient markets for the following reasons, among others:

(a) Unum stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) according to the Company's 2017 Form 10-K, Unum had more than 221 million shares outstanding as of February 20, 2018, demonstrating a very active and broad market for Unum securities;

(c) as a regulated issuer, Unum filed periodic public reports with the SEC;

(d) Unum regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e) unexpected material news about Unum was rapidly reflected in and incorporated into prices for the Company's securities.

249. As a result of the foregoing, the markets for Unum securities promptly digested current information regarding Unum from publicly available sources and reflected such information in the prices of Unum securities. Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of Unum securities.

250. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding their business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' omissions set forth above, that requirement is satisfied here.

## XIII. CLASS ACTION ALLEGATIONS

251. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Unum securities during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

252. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Unum stock was actively traded on the NYSE. As of April 30, 2018, there were over 221 million shares of Unum stock outstanding, held by thousands of shareholders. Record owners and other members of the Class may be identified from records maintained by Unum or its transfer agent and/or may be notified of the pendency of this action electronically, or by mail, using notice procedures similar to those customarily used in securities class actions.

253. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

254. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

255. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Unum;

(c)     whether the prices of Unum securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

256.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### (Against All Defendants)

257.    Plaintiff incorporates the foregoing paragraphs by reference.

258.    Unum and the Individual Defendants made disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

259.    These Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Unum securities.

260.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, Plaintiff paid artificially inflated prices for Unum securities, and suffered losses when the relevant truth was disclosed.  Plaintiff would not have purchased Unum securities at the prices paid, or at all, if Plaintiff had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

261.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Unum securities.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### (Against the Individual Defendants)

262.     Plaintiff incorporates the foregoing paragraphs by reference.

263.     The Individual Defendants acted as controlling persons of Unum within the meaning of §20(a) of the 1934 Act.  By virtue of their positions, stock ownership, shareholder agreements and their power to control public statements about Unum, the Individual Defendants had the power and ability to control, and did control, the actions of Unum and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Declaring that Defendants violated the 1934 Act;

B.     Determining that this action is a proper class action, and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

C.    Awarding Plaintiff and the Class compensatory damages at an amount to be

determined at trial and pre-judgment and post-judgment interest thereon;

D.    Awarding Plaintiff's reasonable costs and expenses, including attorneys' fees; and

E.    Awarding such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

DATED: January 15, 2019          ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                           CHRISTOPHER M. WOOD
                                           CHRISTOPHER H. LYONS

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ANGEL P. LAU
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

Lead Counsel for Plaintiff

1519354_1

VANOVERBEKE, MICHAUD &
   TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff

1519354_1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 15, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 1:18-cv-00128-TAV-CHS Pittman v. Unum Group et al (TV3)

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Colin A Chazen**
  chazenc@sullcrom.com

- **Samuel George Darby**
  darbys@sullcrom.com

- **Brian T Frawley**
  frawleyb@sullcrom.com

- **Lionel Z Glancy**
  lglancy@glancylaw.com,lionel-glancy-2522@ecf.pacerpro.com,info@glancylaw.com

- **Tricia Herzfeld**
  triciah@bsjfirm.com,nicolev@bsjfirm.com,ecf-processor@bsjfirm.com

- **Charles H Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Lesley F Portnoy**
  lportnoy@glancylaw.com

- **Robert V Prongay**
  rprongay@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com

- **Howard G Smith**
  hsmith@howardsmithlaw.com

- **J. Gerard Stranch , IV**
  gerards@bsjfirm.com,ecf-processor@bsjfirm.com,jennifers@bsjfirm.com

- **Sabrina E Tirabassi**
  stirabassi@rgrdlaw.com

- **James T Williams , IV**
  jwilliams@millermartin.com,dcurtis@millermartin.com,,elizabeth.green@millermartin.com,deanna.baker@millermartin.com

- **Christopher Martin Wood**
  cwood@rgrdlaw.com,9101599420@filings.docketbird.com,creis@rgrdlaw.com,alau@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)